450 So.2d 990 (1984)
Dallas J. THIBODEAUX, Plaintiff-Appellee,
v.
AMERICAN LAND & EXPLORATION, INC., et al., Defendants-Appellants.
No. 83-681.
Court of Appeal of Louisiana, Third Circuit.
May 16, 1984.
Rehearing Denied June 14, 1984.
Aaron, Aaron & Chambers, Noble M. Chambers, Jr., Crowley, for defendants-appellants.
Privat & Regan, Kenneth O. Privat, Crowley, for plaintiff-appellee.
Before CUTRER, STOKER and KNOLL, JJ.
CUTRER, Judge.
This appeal emanates from a trial court judgment rescinding a royalty deed confected by Dallas J. Thibodeaux, vendor, and American Land & Exploration, Inc., vendee, (American Land).[1] Thibodeaux filed suit to rescind a royalty deed purporting to transfer one-half of his royalty interest in certain lands. Thibodeaux seeks rescission on the ground of fraud or error. From a trial court judgment annulling the royalty deed American Land appealed. We reverse.

FACTS
The facts are generally undisputed. We shall detail Thibodeaux's dealings with his *991 royalty and mineral interests in the subject property to show that Thibodeaux had negotiated several transactions which included transfers of fractional interests and "royalty acre" interests. These activities reflect that Thibodeaux had at least a working knowledge of the term "royalty acre" and the use of fractional interests in transferring his royalty or mineral interests.
Thibodeaux is the owner of an undivided one-half interest in three tracts of land, totaling 29½ acres, located in Acadia Parish.[2] His children own the other undivided share. This ownership structure appears to be the result of the earlier death of plaintiff's wife and the classification of the three tracts as having been community property.
In 1980, Thibodeaux executed a mineral lease of the land to Stone Oil Corporation (Stone Oil), reserving a one-fifth royalty interest in the oil, gas and other minerals. On January 29, 1982, Stone Oil and Thibodeaux executed a second mineral lease, assuming that the first lease had expired. This second lease also reserved one-fifth of the minerals as royalty for the owner/lessor. On that same day, Thibodeaux signed a royalty deed conveying to Stone Oil 3/80 of the minerals over the three tracts of land. Plaintiff was paid $18,000.00 by Stone Oil for this conveyance.
After Thibodeaux filed the suit in question, Stone Oil intervened to protect its royalty interest which it had purchased from Thibodeaux. A compromise settlement was reached in December 1982 between Stone Oil and Thibodeaux and Stone Oil was dismissed from this suit. The compromise settlement set aside the second lease and left the 1980 lease in effect.
It also provided that Stone Oil would be given an option to purchase one-half of the mineral royalty interest owned by Thibodeaux for a consideration of $2,000.00 per royalty acre in the event that Thibodeaux would prevail in this suit against American Land.
In early January 1982, Thibodeaux was approached by a man named Lambert from Lafayette who sought to purchase a portion of Thibodeaux's royalty interest at the rate of $700.00 per royalty acre. When Thibodeaux rejected that offer, Lambert promptly raised his offer to $1,500.00 per royalty acre. Told that this, too, was inadequate, Lambert left and did not contact Thibodeaux again.
In late February 1982, Timothy Supple (the president and sole stockholder of American Land) telephoned Thibodeaux and inquired whether he could purchase some of Thibodeaux's royalty interests. According to Supple, his first offer was rejected by Thibodeaux. Supple testified that he agreed to pay Thibodeaux the same rate agreed to by Stone Oil. Supple stated that Thibodeaux told him that the price was $3,000.00 per royalty acre.[3]
Supple testified that Thibodeaux agreed to sell him one-fourth of his interest (5.9 royalty acres) for $3,000.00 per royalty acre, or a total of $18,000.00. Supple also asked Thibodeaux to inquire of his children if they would sell that same amount. Approximately one week later, Supple again called Thibodeaux and was told that the latter's children were unwilling to sell any more of their interests. Supple then asked Thibodeaux if he would be willing to sell *992 another one-fourth of his share. Supple agreed to pay Thibodeaux $36,000.00 for the two one-fourth interests, equalling one-half of Thibodeaux's holdings. Supple stated that the $36,000.00 figure was reached by multiplying the royalty acres, approximately twelve, by the rate of $3,000.00. Supple stated that Thibodeaux agreed to sell one-half of his one-half interest for the $36,000.00, but the terminology they primarily used in their conversations referred to royalty acres because Thibodeaux preferred to deal in this term. Supple agreed to meet Thibodeaux at his home in Rayne on Saturday, March 6, 1982, approximately three days after their conversation.
Supple accompanied by John K. Harrison, II, a landman who was to serve as a witness for the transaction, drove to Thibodeaux's home on March 6th to complete their sale. Prior to leaving his office for Rayne, Supple prepared both the royalty deed and the draft to Thibodeaux for $36,000.00. Upon arrival, Supple was told by Thibodeaux that an individual from New Orleans had made an offer of $4,500.00 per royalty acre for Thibodeaux's royalty interest.
Considering that Supple's firm offer was more secure than the one from New Orleans, Thibodeaux decided to accept American Land's offer. This decision was made after Supple had called his co-investor in New Orleans in an attempt to determine the identity of the other bidder and to see if Supple's co-investor would be willing to pay $4,500.00 per royalty acre. The unknown New Orleans bidder was tentatively identified as being Barry Doll. Supple told Thibodeaux that they could not match the offer of $4,500.00 per royalty acre for one-half of Thibodeaux's interest on the entire 29½ acres, but they might consider matching it for Thibodeaux's royal interest in the 20 acre tract. Thibodeaux then agreed to just go ahead with their original deed as planned rather than to depend upon the uncertainty of the New Orleans offer.
Shortly thereafter, the parties signed the royalty deed which had been earlier prepared by Supple. Thibodeaux was given a ten day sight draft in the amount of $36,000.00.[4] No one else was present but Harrison who acted as a witness. It is undisputed that the deed was read to Thibodeaux by Supple. The transferring language of that deed is as follows:
"* * * ONE-HALF (½) of the royalty of the oil, gas and other minerals, in and under and that may be produced from the following described lands situated in the Parish of Acadia, Louisiana:

[Description of three tracts of land-29½ acres.]

"IT IS UNDERSTOOD between the parties hereto that this sale is for ONE-HALF (½) of all the royalties owned, now or formerly, by DALLAS J. THIBODEAUX, but in no event shall the royalties conveyed herein equal less that 11.8 royalties acres." (Emphasis added.)
Supple testified that the agreement was for one-half of Thibodeaux's one-half (one-fourth of the total) and that Thibodeaux stated that he did not need to talk to anyone prior to signing the deed. Further, Supple stated that they both knew what they were trading. Thibodeaux testified that he did not intend to transfer one-half of his interest but only intended to transfer one-fourth of same.
On March 7th, the day after Thibodeaux executed the royalty deed to American Land, he spoke with a Mr. Whitewing from Whitewing Oil Properties, Inc. (Whitewing) concerning the sale of royalty interests. As a result of this conversation, a royalty deed between Thibodeaux and Whitewing was executed and filed on March 8th (after American Land's deed) covering one-half of Thibodeaux's royalty interests over the same three tracts of land for a consideration of $80,000.00.
On March 9, 1982, Thibodeaux filed suit seeking a rescission of the royalty sale to American Land.

*993 ISSUE
The issue on appeal is whether the royalty deed was invalid because of fraud or error.

ALLEGATION OF FRAUD
Thibodeaux alleges that a fraud was perpetrated upon him by American Land and, in support of this, he cites Placid Oil Co. v. Taylor, 345 So.2d 254 (La.App. 3rd Cir.1977), writ den., 347 So.2d 261 (La. 1977). The court in Placid nullified the mineral interest conveyance which was the result of a fraudulent inducement by a niece of her elderly, uneducated aunt who had failing eyesight.
In this case, the trial judge could find no fraudulent actions by Supple; nor do we. Fraud, being a grave allegation, requires a strict standard of proof; it must be proven by evidence which is strong and convincing. Placid, supra. The record does not support an allegation of fraud by Supple.

ERROR OF FACT
The substance of the oral reasons, given by the trial court, for rescinding the contract was that Thibodeaux thought he was transferring one-fourth of his royalty interest instead of one-half. The trial court came to this conclusion after finding that Thibodeaux could not read and did not understand the transfer provisions of the contract. The trial court felt that these factors vitiated the required consent to confect the agreement. We disagree.
Our Supreme Court has spoken to the issue of those who seek to rescind a contract, which they have signed, on the basis that they could not read the contract. Tweedel v. Brasseaux, 433 So.2d 133 (La. 1983), states:

"`[S]ignatures to obligations are not mere ornaments.' Boullt v. Sarpy, 30 La.Ann. 494 at 495. Additionally, the courts of our state have long held that `[i]f a party can read, it behooves him to examine an instrument before signing it; and if he cannot read, it behooves him to have the instrument read to him and listen attentatively whilst this is being done.' Snell v. Union Sawmill Company, 259 La. 604 at 608, 105 So. 728 at 730 (1925). Bagneris v. Oddo, 2 Pelt. 278 (La.App.1919) held:

`The presumption is that parties are aware of the contents of writings to which they have affixed their signatures... The burden of proof is upon them to establish with reasonable certainty that they have been deceived.' 2 Pelt at 285."
Thibodeaux has clearly not met his burden of proving that he was unaware of the contents of the contract he signed with American land. Thibodeaux admitted that the deed was read to him by Supple. Supple, additionally, testified that he asked Thibodeaux if he needed anyone else present, but Thibodeaux indicated he did not. Thibodeaux did not rebut this statement. Thibodeaux testified that, although he could not read, he could discern numbers.
The unequivocal language of the deed transfers from Thibodeaux to American Land "ONE-HALF (½) of the royalty...." After describing the lands involved, the deed further states that the sale is for "ONE-HALF (½) of all the royalties owned, now or formerly, by DALLAS J. THIBODEAUX, but in no event shall the royalties conveyed herein equal less than 11.8 royalty acres."
Supple testified that the parties knew what they were dealing with and that Thibodeaux agreed to sell one-half of his share. Harrison corroborated this testimony. Both Harrison and Supple stated that the deal was primarily based on the royalty acre number 11.8 and that Thibodeaux was paid $3,000.00 per royalty acre, which was rounded off at $36,000.00. Thibodeaux sought to refute this by claiming that he did not know what a royalty acre was then or on the day of trial.
In examining the record we find that, when Thibodeaux was asked if he knew what a royalty acre was, his answer was that he wasn't "too familiar" with it. Regardless *994 of whether he knew how to compute royalty acreage, Thibodeaux had often dealt with the concept of royalty acres. By his own testimony, Thibodeaux admitted having dealt in January 1982, with Lambert regarding the sale of his royalty interests on the basis of royalty acres. Thibodeaux also admits having sold to Stone Oil and to Whitewing on the basis of royalty acreage. Thibodeaux stated that his deal with Stone Oil of $2,000.00 per royalty acre was "fair enough." It is only as to his dealings with Supple that Thibodeaux denies having discussed royalty acres. The royalty deed signed by Thibodeaux unequivocally transfers one-half of his royalty interests to American Land. The fraction of one-half is twice mentioned in the document, and the intention to transfer that amount is further reiterated by the reference to 11.8 royalty acres as being the amount intended to be conveyed. The 11.8 figure was also used in the royalty deed signed the next day by Thibodeaux wherein he admits to having transferred one-half of his royalty interests to Whitewing.
In each of the transactions that we have reiterated Thibodeaux dealt in royalty acres. His assertion of ignorance can be given little credence. We conclude that the trial court was clearly wrong in finding that Thibodeaux misunderstood the terms of the royalty deed he executed.
We must further observe that, even if Thibodeaux had misunderstood the terms of the royalty deed, he cannot prevail in this rescission action under the law of unilateral error.
In Nugent v. Stanley, 336 So.2d 1058 (La.App. 3rd Cir.1976), this court held as follows:
"It is well settled in our law that consent to a contract may be vitiated by an error of fact and that without consent there is no contract. LSA-R. C.C. Articles 1819, 1820, 1923.
"Article 1821 states `That is called error of fact, which proceeds either from ignorance of that which really exists, or from a mistaken belief in the existence of that which has none.' Article 1826 provides in effect that error of fact as to the principal cause of the agreement does not invalidate a contract unless the other party knew or should have known it was the principal cause.

"The jurisprudence under these code articles establishes that a contract may be invalidated for unilateral error as to a fact which was a principal cause for making the contract, where the other party knew or should have known it was the principal cause. Savoie v. Bills, 317 So.2d 249 (La.App. 3rd Cir. 1975)."

As we consider the facts of this case, the error alleged by Thibodeaux was unilateral. To prevail in this action, Thibodeaux must show that Supple either knew or had reason to know that Thibodeaux did not understand that he was transferring one-half instead of one-fourth of his royalty interests.
The trial court, in its oral reasons, stated as follows:

"[I]'m convinced equally Mr. Supple was going out there thinking he was buying, you know, one-half of all of this man's interest....."
The record fully supports this conclusion. Supple's intention was to purchase one-half of Thibodeaux's royalty. He had no reason to believe that Thibodeaux misunderstood the terms of the transfer.
Having failed to show that Supple had knowledge or had to reason to know of an alleged error, the contract cannot be set aside on the ground of the lack of consent.
We, therefore, find that the trial court was clearly wrong in rescinding the deed on the ground of error.
For these reasons, the judgment of the trial court is reversed, set aside and Thibodeaux's suit is dismissed. All costs of the trial court, as well as the costs of this appeal, shall be paid by plaintiff-appellee, Dallas J. Thibodeaux.
REVERSED AND RENDERED.
NOTES
[1] Also made a defendant was Timothy Supple, the president and sole stockholder in American Land. However, judgment was only rendered against American Land, which was also cast with costs of the suit. Accordingly, we only address the singular defendant, American Land.
[2] The first tract contains three acres; the second contains six and one-half acres and the third tract contains twenty acres.
[3] Supple testified that the term "royalty acre" is a commonly used industry term. He also stated that production distribution is based on the ownership of royalty acres which are derived by converting ordinary acreage into royalty acreage on the basis of the standard one-eighth (1/8) royalty, which was the fraction ordinarily reserved by owners leasing their land for oil production. Thibodeaux had, however, reserved a one-fifth royalty interest in the production under his lease with Stone Oil, thus creating more royalty acreage on the land than would have existed under a one-eighth reservation.

Harrison and Supple both calculated that the 29.5 acres owned by Thibodeaux and his children contained 47.2 royalty acres. In his deed to American Land, Thibodeaux transferred one-half of his one-half interest, or one-fourth of the total (or 11.8) royalty acres.
[4] Thibodeaux did not negotiate the draft.