IzWILLIAM V. REDMANN, Judge Pro Tern.
Defendant homeowners appeal a judgment awarding plaintiff real estate brokers a commission on a buy-sell agreement for defendants’ Amite home, which the buyer refused to perform because one of four lawyers consulted (none of whom testified) deemed the title unmerchantable.
We reverse. Defendants owe a commission only if their title was not merchantable, or they otherwise prevented the sale. Plaintiffs did not prove either such case.
Weldon Russell (sometimes hereafter “plaintiff’[2]) had in the past acted as real estate agent on “three or four” successive sales of a house in Amite, first to a Mrs. Raacke, then from her to a Louis Fay, and then from him to defendants, who, when they were moving away, listed it for sale with plaintiff. Plaintiff obtained an offer from a Mr. Giardina, conditioned on obtaining a mortgage loan, which defendants accepted, forming the buy-sell contract under which plaintiffs claim a commission.
The buyer selected Mr. Tillery, a lawyer approved by the lender, to close the sale and mortgage. Although Tillery did not testify, there is undisputed hearsay that he deemed defendants’ title defective (and there is undisputed hearsay that three other lawyers did not). Weldon Russell himself testified of Tillery’s view:
It seems that when Mrs. Raacke ... purchased the property [about 1962, defendant testified], she was still technically, married to Mr. Raacke whom she had not seen since 1948 ... And ... because there was the omission of the language in the deed, that Mrs. Raacke procured the property with her separate and paraphernal funds, that it indeed ... still constituted a community action [sic; asset?]. So therefore, under Louisiana inheritance laws, as he appreciated them, that Steven Raacke and Norbert or Tippy Raacke, were to be heirs and there — it seems that maybe Mr. Raacke had had another family some-where_ [T]hat’s what Tillery’s problem was, that even though Mrs. Raacke had not seen the guy since %8, and ... she bought it with her money she made teaching school; it was, in Mr. Tillery’s opinion, that it was not stated that it was her separate money, even though she never received money, according to Steven and Tippy, for anything since 1948, that it was — it was community. That was his opinion. And then, \¿t was Mr. Reid’s opinion that that was not so.[3] [Emphasis added.]
Plaintiff had earlier testified:
*358 Q. ... Weren’t you given to understand also, that' ... another attorney approved by the Ponchatoula Homestead, was ready, willing and able to close this deal? Mr. Allen Pierson? A. I think Mr. Reid said that Mr. Pierson may close it, but ... Mr. Giardina did not go through with that, or— I — no, I don’t remember— ... precisely that. That could have happened, though I wouldn’t say that it didn’t happen. Q. And Mr. Reid offered to buy title insurance? A. Oh, he did. Q. Okay. A. I remember that. Q. Okay. A. Mr. Reid always maintained that the title was good_ Q. ... During that 45 day [automatic extension] period, after Mr. Tillery refused to close, attorneys approved by Ponchatoula Homestead were ready, willing and able to close that, but Mr. Giardina did not— A. Well,— Q. —want to go through with it? A. Well, that’s hearsay, ... I don’t ... really know that. ... I do [know], that Mr. Reid did want to provide ... title insurance, but I don’t think that was acceptable to Mr. Tillery_
Tillery declined to pass the act of sale, and advised Giardina that the title was not merchantable.
Ms. Renee Mangano, an officer of the lender, testified that, when informed by Tillery that he would not close the loan,
[W]e asked Mr. Giardina if he wanted to choose another attorney, and he did not. Q. He did not? A. No sir. Q. So, you were trying to line up another attorney that would actually do the closing? A. Well, to see if he could get the title cleared and proceed with the closing. Q. Mr. Giardina told you no. A. He said no— Q. Okay. A. —He wanted to go through Tillery. Q. Okay. A. And there’s nothing we can do about that, if— Q. Right. A. —The customer wants — has a particular attorney that he wants to go through.
Defendant Donald Smith testified that at the time the closing was to have occurred, he located plaintiff Weldon Russell in the office of attorney Reid, who had closed the earlier sales of the property, and that Reid said he did not know why Tillery was not closing. Smith then called other attorneys:
|4Mr. Pierson, he was willing to close the deal for us, because he was — he was approved by Ponchatoula Homestead to close the deal. So, we were getting [in] touch with Mr. Giardina, and trying to tell him, we need to get Tillery to get the information over to Mr. Pierson, he would close the deal.... Gerald [Giardina] says no, if Tillery doesn’t close it, I don’t want it.... Well, then, I started trying to find another attorney, I thought maybe he just wasn’t happy with Mr. Pierson. We even talked to a Mrs. Scott, I — I don’t remember her first name, but she was supposedly also approved by [the lender].... She even advised, she didn’t see a problem with the — the closing, and if she had the paperwork, she would close it.... So, we talked to Mr. Giardina again. No, he wanted Tillery.... [W]ell, I’d talked to two attorneys that evening, who said there was no problem with it. And that Saturday morning, I went and contacted every attorney I know, and explained the whole situation to ’em.
On objection to relevancy by plaintiffs, the court agreed that “the issue of whether or not there was a bona fide problem with the title is not an issue that I’m called upon to address” and no further testimony on other attorneys’ opinions was adduced.
The listing agreement broadly provides “a commission of six percent on the gross amount of any agreement to sell.”
The buy-sell contract provides “seller agrees to pay the agent’s commission of six percent of selling price which commission is earned when this agreement is signed by both parties and when the mortgage loan, if any, has been secured.” It also provided that the loan was considered obtained once the lender committed to make the loan, although “subject to approval of title.”
The contract further provides, as to title:
The seller shall deliver to purchaser a merchantable title, and his inability to deliver such title within the time stipulated herein shall render this contract null and void ..., reserving unto agent the right to recover commission.
*359 Plaintiffs claim entitlement to commission from the sellers on the basis that the lender did commit the loan, subject to approval of title, and in that sense the mortgage loan was secured and the commission was therefore earned. Plaintiffs argue that whether or not the sellers’ title was merchantable is immaterial to their claim for commission.
We disagree. Case law qualifies the broad language of the listing contract and the buy-sell contract on which plaintiffs rely. The trial judge quoted the summary of supreme court eases by Leaman v. Rauschkolb, 1 So.2d 388, 341 (La.App.Orl.1941):
15[A]gency contracts of this kind should be interpreted to mean that the vendor hires the real estate agent with the intention of becoming liable for a commission only in the event a sale of the property is consummated; ... and that the vendor is not responsible for a commission in the event the sale is not consummated unless (1) it appears that he, the vendor, was at fault in that he refused to convey the title to the purchaser without cause or (2) unless he is unable to consummate it because his title, at the time he agreed to sell, was not marketable.
The trial judge apparently deemed the “unless title was not marketable” concept outweighed by the expression of Farrier v. Guillory, 342 So.2d 1167, 1169 (La.App. 1st Cir.1977): the right to commission “is generally not dependent upon the validity of the title of the seller, or upon the eventual passing of the act of sale, and ... is earned when the agreement to purchase is executed....” He also noted Gertrude Gardner, Inc. v. Campo, 411 So.2d 681 (La.App. 4th Cir.1982), in which the buy-sell contract reserved, in the trial judge’s words, “the agent’s right to recover a commission even if the seller’s title was not merchantable.” [4] He further cited James M. Vardaman & Co. Inc. v. Ponder, 443 So.2d 697, 699 (La.App. 1st Cir.1983), writ denied, 446 So.2d 317 (La.1984), repeating that otherwise earned commission is unaffected by nonconsummation of the sale “because the title is found to be unmerchantable.”
The trial judge therefore awarded the plaintiffs 6% commission plus $1,500 attorney’s fees.
We have no dispute with the interpretations by Farrier, Gardner, and Vardaman and similar cases of contracts like that present. But those rulings are applicable only in cases in which, as in themselves, it is established that the seller’s title is unmer-chantable (or even non-existent). On the other hand, where the seller’s title is merchantable at the time of the buy-sell contract, the agent is not entitled to a commission if some other reason prevents the sale. Guy L. Beano, Inc. v. Michel, 191 La. 233, 185 So. 9 (1938)). We conclude, from this contract wording and especially from Beano and Lea-man, that, when the sale is not consummated because the buyer’s lawyer contends that the title is unmerchantable although other lawyers disagree, an agent who sues for a commission from the seller must establish that the title is not merchantable.
In this case, where two lender-approved lawyers say the title is merchantable (and the lender’s testimony shows its willingness to lend on the strength of those lawyers’ opinion), and yet a third lawyer offered title insurance, the agent has not shown that the title is unmerchantable by evidence that one lawyer thought the title unmerchantable (see n. 4 above). The agent has thus not shown entitlement to a commission.

Becree

The judgment appealed is reversed and plaintiffs’ suit is dismissed at plaintiffs’ cost.

. The petition describes plaintiffs as Robert Weldon Russell III and Mary Fumiss Russell d/h/a Weldon Russell Real Estate. The only Russell to testify was Weldon Russell, and he is sometimes called "plaintiff” in this opinion.

. "Under the double declaration rule ..., a husband {but not a wife) was precluded from proving an immovable was his separate property if the act of acquisition did not contain a declaration that (1) the asset was acquired with separate funds and (2) that he intended it to be his separate property.” Spaht & Hargrave, Matrimonial Regimes (16 La.Civil Law Treatise), § 4.3, p. 129 (emphasis added). Even as to husbands, that requirement has been retroactively abolished. Tullier v. Tullier, 464 So.2d 278, 283 (La.1985). See former C.C. art. 2334 (1870), 3d par., in effect when Mrs. Raacke bought the subject property about 1962:
The earnings of the wife when living separate and apart from her husband although not separated by judgment of court ... and the property purchased with all funds thus derived, are her separate property.

. There the title was shown to be unmerchanta-ble in the opinion of the lender’s attorneys. The seller’s own attorney did not contend the contrary, but "was unable to complete the curative work to the satisfaction of the [lender’s] attorneys.” 411 So.2d at 682. Here, only one attorney approved by the lender deemed the title unmerchantable; two others deemed it merchantable; and a fourth (whether or not approved by the lender) offered title insurance.