736 So.2d 279 (1999)
Dr. Norman P. MORIN, M.D., a Professional Medical Corporation and Dr. Norman P. Morin, Individually, PlaintiffsAppellants,
v.
Dr. Lynn E. FORET, M.D., a Professional Medical Corporation and Dr. Lynn E. Foret, Individually, Defendants Appellees.
No. 98-1020.
Court of Appeal of Louisiana, Third Circuit.
April 14, 1999.
Rehearing Denied June 9, 1999.
*280 Raymond M. Allen, Lafayette, Barry S. Alberts, Catherine M. Masters, Neil Lloyd, Chicago, IL, for Norman P. Morin M.D. et al.
John Stanton Bradford, Lake Charles, for Lynn E. Foret M.D. et al.
Before DOUCET, C.J.; SULLIVAN; PETERS; GREMILLION; and PICKETT, Judges.
PETERS, J.
The plaintiffs and defendants-in-reconvention in this litigation are Dr. Norman P. Morin, M.D., a Professional Medical Corporation (the Morin corporation), and Dr. Norman P. Morin, individually. The defendants and plaintiffs-in-reconvention are Dr. Lynn E. Foret, M.D., a Professional Medical Corporation (the Foret corporation), and Dr. Lynn E. Foret, individually. The litigation arises from a contract for the sale of Dr. Morin's medical practice entered into between the two medical corporations. In the contract, the Morin corporation sold Dr. Morin's active medical practice to the Foret corporation subject to specific terms and conditions. The trial court found the contract to be invalid and awarded judgment in favor of Dr. Foret and the Foret corporation in the amount of $140,173.77. The award represents the amount already paid to the Morin Corporation by Dr. Foret and his corporation. *281 Dr. Morin and the Morin corporation appeal, asserting three assignments of error.
In 1988, both Dr. Morin and Dr. Foret were practicing orthopedic surgeons in Lake Charles, Louisiana, and were practicing their profession in separate locations. Both practiced through their respective professional corporations. In that year, Dr. Morin began to consider retirement and what he might be able to do with his active practice. He initially made some inquiries within the profession to determine the value of his active practice, and based on the information obtained from those inquiries, concluded its value to be $250,000.00. With that figure in mind, he began negotiations with two Lake Charles orthopedic surgeons, Drs. Cohen and Walker. The negotiations' continued over a period of months, but just before a final agreement was consummated, Dr. Foret approached Dr. Morin about contracting with him instead. Dr. Morin then supplied Dr. Foret with a copy of the proposed contract that had been supplied him by Drs. Cohen and Walker, and a new round of negotiations began.
According to Dr. Morin, Drs. Cohen and Walker had tentatively agreed to a maximum purchase price of $250,000.00, to be paid over a period of time. The payout was to be based on a percentage of the fees derived from treating Dr. Morin's patients, with Drs. Cohen and Walker receiving seventy percent and Dr. Morin receiving thirty percent. Dr. Foret suggested he would pay Dr. Morin forty percent, instead of the thirty percent suggested by Drs. Cohen and Walker, if Dr. Morin would reduce the ultimate maximum purchase price to $225,000.00. Dr. Morin agreed and, using the Cohen/Walker contract as a working model and ultimate basis of the final contract, they entered into the disputed written agreement on November 7, 1988.[1]
While the contract is not artfully drawn, it is clear in its intent. Basically, it provided for an office sharing arrangement, an initial transfer of some of Dr. Morin's patient records to Dr. Foret, and an ultimate transfer of all of Dr. Morin's patient records to Dr. Foret. The office sharing agreement provided that Dr. Foret provide Dr. Morin with office space "for so long as Morin shall request but in any event not later than January 1, 1999, at no cost to Morin." Under the agreement, Dr. Morin could continue to see patients in Dr. Foret's office and had complete control over his schedule within the office. It authorized him to hire one employee at his expense, and, although he could use Dr. Foret's office supplies, he was required to reimburse him for the use of the supplies on a monthly basis. A notice mutually agreed upon by the physicians was to be placed in the local newspaper advertising the association of the two offices. Accounts receivable arising from Dr. Morin's treatment of patients would remain his property, subject to future agreements, and the contract clearly stated that no partnership was being established between the two physicians.
Regarding files existing at the time of the contract, the agreement provided that Dr. Morin would transfer to Dr. Foret all of his "right, title and interest to his patient records, charts, x-rays, patient lists, if any, and various other records concerning Morin's practice designated by Morin in his sole discretion." These records were to be transferred to Dr. Foret's office at Dr. Morin's expense, and Dr. Morin retained the right of access to the records.
The contract required the doctors to run a second advertisement in the local newspaper at the time of Dr. Morin's retirement. Additionally, at that time Dr. Morin was obligated to write a letter to all of his active patients, announcing his retirement, informing them that he was transferring *282 their records to Dr. Foret, and recommending Dr. Foret to them for future treatment. The remaining patient records would be transferred to Dr. Foret at that time.
In exchange for Dr. Morin's practice, Dr. Foret agreed to pay the Morin corporation or Dr. Morin's estate a minimum of $125,000.00 and a maximum of $225,000.00. The first $25,000.00 was to be paid on the date the Morin corporation records were received in the Foret corporation office, and the remaining balance was to be paid from professional fees received by Dr. Foret in treating Dr. Morin's patients during the period of association and thereafter. Forty percent of the revenue "generated and collected from or on behalf of former Morin patients who see or are treated by Foret" would be the source of the remaining payments.
Dr. Foret paid the initial $25,000.00 in October of 1988 and, thereafter, began paying Dr. Morin forty percent of the monthly profits generated from his former patients as required by the agreement. The association continued without difficulty for three years, with Dr. Foret making monthly payments over this period totaling $140,173.77. However, after three years, Dr. Foret ceased making payments. He now asserts that Dr. Morin has been paid enough and that Dr. Morin had agreed to retire within six months of November 7, 1988. Although nowhere in the contract is there a reference to a six-month retirement requirement, Dr. Foret asserts there was an oral understanding to that effect, and, therefore, the contract is null for mistake of fact as to the principal cause. Dr. Foret admits he did not read the contract before he signed it.
Dr. Morin retired in July of 1992. It is undisputed that during the period of association, Dr. Foret collected over $1,000,000.00 treating Dr. Morin's former patients. Dr. Morin claims Dr. Foret urged him not to retire since they were still generating a significant amount of business together, and he even urged Dr. Morin's wife to talk him out of his decision to retire. Shortly thereafter, Dr. Foret claimed he read the contract for the first time, thought Dr. Morin had been paid too much, and felt that he never really received Dr. Morin's practice.
Dr. Morin and the Morin corporation sued Dr. Foret and his corporation for the remainder of the purchase price agreed to under the contract. Dr. Foret filed an answer and a reconventional demand seeking reimbursement of the amount he paid Dr. Morin and his corporation pursuant to a null contract. Dr. Morin and his corporation appeal the judgment in favor of Dr. Foret and his corporation.

OPINION
Dr. Morin raises three assignments of error. First, he argues the trial court erred in finding the contract vitiated due to error as to fact which was the principal cause of the contract, since Dr. Foret relied on the presence of a term which was not included in the contract, without reading the contract terms. Second, Dr. Morin argues the trial court erred in finding the contract vitiated due to error as to the principal cause, because no evidence was presented to show Dr. Morin knew or should have known that a six-month limit on his continued practice was Dr. Foret's principal cause for entering into the contract. Last, Dr. Morin asserts the trial court's judgment unjustly enriched Dr. Foret because he received Dr. Morin's medical practice for free. Because we find the trial court erred in voiding the contract, we need not consider the third assignment of error.
The terms of the contract represent the law between the parties. La.Civ.Code art. 1983. Additionally, the disputed agreement states that it "contains the entire understanding of the parties and no other statements or representations, other than those contained herein, were relied upon by any party in entering into this Agreement." (Emphasis added.)
*283 The contract itself contains no six-month retirement provision. On the contrary, it specifically provides that the period of association could last until January 1, 1999. Dr. Foret argues that because he did not read the contact before signing it, the contract should be vitiated due to error as to the principal cause. The jurisprudence consistently refutes this position, and, in fact, holds the signing party to the agreement. Thibodeaux v. American Land & Exploration, Inc., 450 So.2d 990, 993 (La.App. 3 Cir.), writ denied, 458 So.2d 118 (La.1984) states:
Our Supreme Court has spoken to the issue of those who seek to rescind a contract, which they have signed, on the basis that they could not read the contract. Tweedel v. Brasseaux, 433 So.2d 133 (La.1983), states:
"`[S]ignatures to obligations are not mere ornaments.' Boullt v. Sarpy, 30 La.Ann. 494 at 495. Additionally, the courts of our state have long held that `[i]f a party can read, it behooves him to examine an instrument before signing it; and if he cannot read, it behooves him to have the instrument read to him and listen attentively whilst this is being done.' Snell v. Union Sawmill Company, 259[159] La. 604 at 608, 105 So. 728 at 730 (1925). Bagneris v. Oddo, 2 Pelt. 278 (La.App.1919) held:

`The presumption is that parties are aware of the contents of writings to which they have affixed their signatures ... The burden of proof is upon them to establish with reasonable certainty that they have been deceived.' 2 Pelt. at 285."

(Italics in original) (bold text supplied).
The contract under consideration herein was tailored specifically for the benefit of these two parties. In fact, both parties to this contract participated in negotiations and created the terms of the agreement to achieve the goals to which they agreed in those negotiations. Furthermore, this court cannot hold that the failure to read the terms of a contract should inure to that party's benefit if he thought the contract contained a term that it in fact did not contain.
The trial court also erred in relying on the testimony of witnesses who asserted that they understood Dr. Morin would retire within six months of the association. As a general rule, extrinsic evidence may not be admitted to "negate or vary" the contents of a written contract. La.Civ.Code art. 1848. Furthermore, if "the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ.Code art.2046. When the language of a contract is clear and unambiguous, a court must interpret the contract solely by reference to the four corners of the document. Woolf & Magee v. Hughes, 95-863 (La.App. 3 Cir. 12/6/95); 666 So.2d 1128, writ denied, 96-0073 (La.3/15/96); 669 So.2d 427. Whether or not the terms of a contract are ambiguous or not is a question of law, and appellate review of questions of law is simply to discern whether the trial court's interpretive decision is legally correct. McCrory v. Terminix Serv. Co., Inc., 609 So.2d 883 (La.App. 4 Cir.1992). Since the question of ambiguity in a contract is a matter of law, the correct standard for review would be that which is appropriate for review of legal error. See Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975) (providing for appellate de novo review of a trial court's legal error).
Here, the terms of the contract provide for a flexible period of time during which Dr. Morin can taper off his practice of medicine (during which time he did, in fact, reduce the number of days he practiced, and forwarded a significant number of patients and procedures over to Dr. Foret). Because the terms of the contract are not ambiguous, they control the law between these parties, and thus, the trial court erred in relying on the testimony of *284 witnesses who were not parties to the document to show that the parties had an intent contrary to the express term regarding the period of association. According to this de novo review, we find the trial court erred in holding the contract was null for mistake of fact constituting primary cause.
Given our conclusion that the contract is valid, we also find that the trial court erred in rejecting the plaintiffs' demands for the amounts due under the contract. Because Dr. Foret and his corporation were obligated to pay forty percent of the fees received from treating Dr. Morin's former patients, and because Dr. Foret has received in excess of $1,000,000.00 in fees from Dr. Morin's former patients, it is clear that under the forty percent requirement of the contract, Dr. Morin is entitled to the full $225,000.00. Since Dr. Foret has only paid $140,173.77, Dr. Morin is still owed $84,826.23.

DISPOSITION
For the foregoing reasons, the judgment of the trial court is reversed. Judgment is rendered in favor of Dr. Norman P. Morin, M.D., a Professional Medical Corporation, and Dr. Norman P. Morin, and against Dr. Lynn E. Foret, M.D., a Professional Medical Corporation, and Dr. Lynn E. Foret in the amount of $84,826.23, together with legal interest from judicial demand until paid and for all costs of these proceedings.
REVERSED AND RENDERED.
PICKETT, J., dissents and would affirm the trial court's judgment.
NOTES
[1] Although the preamble to the contract asserts that both doctors appeared only in their corporate capacity, each signed the contract individually and as a representative of their respective corporations.