# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 05-0270

**TAMMY BRAFA D/B/A MAGNOLIA REALTY GROUP**

**VERSUS**

**CHARLES J. CHRIST, ET UX.**

\*\*\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
THIRTIETH JUDICIAL DISTRICT COURT,
PARISH OF VERNON, NO. 71,407,
HONORABLE JOHN C. FORD, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

**JIMMIE C. PETERS**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Jimmie C. Peters, and Billy H. Ezell, Judges.

**AFFIRMED.**

**Tony C. Tillman**
**Attorney at Law**
**Post Office Drawer 648**
**Leesville, LA 71496**
**(337) 239-7983**
**COUNSEL FOR PLAINTIFF/ APPELLANT:**
    **Tammy Brafa d/b/a Magnolia Realty Group**

**James R. Mitchell**
**Attorney at Law**
**607 South Fifth Street**
**Leesville, LA 71446**
**(318) 239-6709**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
    **Charles J. Christ, et ux.**

PETERS, J.

This litigation arises from a written real estate listing agreement (Listing Agreement) between the plaintiff, Tammy Brafa (Ms. Brafa), a Vernon Parish realtor doing business as Magnolia Realty Group, and the defendants, Charles J. Christ and Donna Christ (the Christs), who own the immovable property which is the subject of the Listing Agreement. Ms. Brafa filed suit to enforce the Listing Agreement and collect her commission, attorney fees, and costs of the litigation. After trial, the trial court rejected Ms. Brafa's demands, and she has perfected this appeal. For the following reasons, we affirm the trial court judgment in all respects.

## DISCUSSION OF THE RECORD

There is little factual dispute in this litigation. Sometime prior to February 20, 2003,[1] the Christs decided to sell their residence on 117 Prairie View Lane in Anacoco, Louisiana, and entered into the Listing Agreement at issue in this litigation. The Listing Agreement gave Ms. Brafa the exclusive listing for the property for the period from February 20, 2003, to 12:00 p.m. on August 20, 2003, and set the asking price at $118,000.00. It further provided that the Christs would pay Ms. Brafa a five percent commission "on the gross amount of any transaction (agreement to sell or exchange) that may be negotiated during the existence of this contract by [Ms. Brafa], by [the Christs], or by any other person" and that Ms. Brafa would be entitled to the five percent commission even if the property was "withdrawn from sale during the term of this listing."

Ms. Brafa negotiated an offer of purchase of the property for $118,000.00 from Timothy P. Murphy and Kate H. Murphy (the Murphys), and, on April 22, 2003, the Murphys and the Christs executed a purchase-sell agreement (Purchase Agreement)

---

[1]We say sometime prior to February 20, 2003, because the Listing Agreement is not dated and the evidentiary record does not supply the date it was executed.

which provided among other things that the act of sale between the Christs and Murphys would take place on June 2, 2003, and that occupancy would be granted to the Murphys at that time. It further provided that "[t]ime is of the essence and all deadlines are final except where modifications, changes or extensions are made in writing and signed by all parties to this agreement." However, it also provided that the sale was conditioned upon the Murphys being able to borrow $120,300.00 to complete the transaction. On April 22, and pursuant to the terms of the Listing Agreement, the Murphys tendered a $500.00 deposit, refundable at the time of closing of the transaction.

After signing the Purchase Agreement, the Christs stored their household goods, vacated the residence, and moved into a travel trailer. Additionally, they began making arrangements to start construction on a new home after the June 2 sale.

The closing anticipated by the Purchase Agreement did not take place on June 2, as the mortgage company with whom the Murphys were negotiating for long-term financing, in the words of Ms. Brafa, "dropped the ball," and the closing funds were not available. Ms. Brafa canceled the closing and informed the Christs that it would occur the next day. However, on that day, Ms. Brafa informed the Christs that the closing was again delayed and that she could not give them a specific date when the loan funds would be available. By this time, the Christs' mortgage payment was coming due, their homeowners' insurance was about to be cancelled and needed reinstating, and they were still trying to get their new home construction started. In short, everything with which they were then involved depended on closing the sale as quickly as possible.

2

In the same conversation in which she advised the Christs of the open-ended delay, Ms. Brafa attempted to convince them to rent the property to the Murphys on a day-to-day basis, a suggestion which the Christs rejected. Ms. Brafa then tried to convince the Christs to enter into a new purchase agreement with the Murphys. The Christs informed her that they had changed their minds about selling the house and were going to begin moving back in.

Two days later, on June 5, Ms. Brafa and the Murphys signed a document prepared by Ms. Brafa (hereinafter referred to as the "Release")[2] which provided in pertinent part:

5 June 2003

Re:   Contract to Purchase and Sell dated 4-22-03
      117 Prairie View Lane, Anacoco
      Charles & Donna Christ
      Timothy & Kate Murphy

To Whom It May Concern:

I do not intend to accept the new offer to purchase, for our home at 117 Prairie View Lane, Anacoco with the new closing date and will not grant any extension to the closing date. I do not intend to sell our home and would like to remove it from the market. I do hereby release all parties to the contract dated April 22, 2003. We agree to release the $500.[00] good faith deposit to the buyers Tim & Kate Murphy, to purchase another property.

This language was followed by the typed names of Charles Christ, Donna Christ, Timothy Murphy, Kate Murphy, and Tammy Brafa, with space between each typed name for a signature. The Christs signed the release on June 16 or 17.[3]

---

[2]The record reflects that Ms. Brafa's attorney had no part in the preparation or execution of this document. Ms. Brafa testified in response to her own attorney's questions that she prepared it without input from anyone else.

[3]Ms. Brafa testified that she thought the Christs signed the Release on June 5 as well, but she was not sure in her testimony. She assumed so only because the second Purchase Agreement was prepared the next day. Mr. Christ specifically recalled signing it sometime after June 13.

The Murphys finally received complete loan approval on June 6. On that day, Ms. Brafa prepared another purchase-sell agreement (second Purchase Agreement), which the Murphys signed. She then telephoned the Christs in an effort to convince them to sign the new agreement, but they refused. The Christs completed their move back into the house on June 7 or 8.

On June 9, Ms. Brafa's attorney mailed a formal demand letter to the Christs. The letter's singular purpose was to urge the Christs to go forward with the transaction contemplated in the April 22 Purchase Agreement. It urged the Christs to promptly agree to conclude the sale, but did not mention the second Purchase Agreement. Rather, the letter informed the Christs that the delay in the closing scheduled for June 2 did not relieve them of their obligation in the Purchase Agreement or the Listing Agreement and that the latter agreement did not expire until August 20, 2003. Specifically, it informed the Christs that if they did not go forward with the sale, their failure to do so would subject them to "paying damages to several individuals." The Christs received the letter on June 13.

The Christs went to Ms. Brafa's office on June 16 or 17 to sign the Release, but Ms. Brafa was not present. Instead, they were presented with the Release by Ms. Brafa's employee, who is identified in the record only as "Wilma." The Christs assumed this ended the entire relationship. However, this suit followed.

**OPINION**

Nothing in the Listing Agreement suggests that the failure to sell the Christs' property to the first prospect would result in its termination. Thus, considering only the Listing Agreement, Ms. Brafa still had an exclusive listing of the property through noon on August 20, 2003, even after the failed June 2 sale. Ms. Brafa argues on

4

appeal that, under the Listing Agreement, once the agent finds a buyer who makes an offer that is accepted by the seller, the seller owes the commission whether the sale takes place or not. She cites no authority for this sweeping proposition,[4] but the argument begs the question. If the Listing Agreement was terminated by agreement of the parties, no commission was due. Accordingly, the decisive issue in this litigation is whether the subsequently executed Release terminated the Listing Agreement as well as released the Murphys' $500.00 deposit. Ms. Brafa asserts that it did not, while the Christs assert the opposite view.

When the terms of a written contract are susceptible to more than one interpretation, or there is uncertainty or ambiguity as to the contract's provisions, or the parties' intent cannot be ascertained from the language employed, parol evidence is admissible to clarify the ambiguity and to show the intention of the parties. La.Civ.Code art. 1848; *McCarroll v. McCarroll*, 96-2700 (La. 10/21/97), 701 So.2d 1280. Whether or not the terms of a contract are ambiguous is a question of law, and appellate review of questions of law is simply to determine whether the trial court's interpretive decision is legally correct. *Morin v. Foret*, 98-0120 (La.App. 3 Cir. 4/14/99), 736 So.2d 279, *writ denied*, 99-2022 (La. 10/29/99), 748 So.2d 1165.

In its reasons for judgment, the trial court stated the following with regard to the intent of the Release:

> Plaintiff contends and her testimony reflects that the sole purpose of the [Release] was intended to effect a return of the $500.00 deposit. Defendant[s], however, contend[] that they had made it clear they had changed their minds about selling their house and that its purpose was to terminate the listing agreement as well as return the $500.00. . . .

---

[4]The Christs were ready to complete the sale on June 2. It was not their fault that it did not take place. Where the seller's title is merchantable at the time of the buy-sell contract, the agent is not entitled to a commission if some other reason prevents the sale. *Russell v. Smith*, 94-1875 (La.App. 1 Cir. 6/30/95), 671 So.2d 356, *writ denied*, 95-1972 (La. 11/13/95), 667 So.2d 521.

> Although the [Release] did address the return of the deposit, it also contained the unequivocal sentence "I do not intend to sell our [home] and would like to remove it from the market". The realtor signed the letter along with others present and the Court considers it to be the best evidence of the parties['] intent at the time of its execution.
>
> Therefore, the Court concludes that it is more probable than not the listing agreement was extinguished on June 5, 2003.

Thus, the trial court did not specifically state that it found the Release uncertain, ambiguous, or susceptible to more than one interpretation. However, in rendering its decision, the trial court specifically referenced the parole evidence submitted with regard to the intent of the parties to the Release and, by doing so, made it clear that it did find the Release to be uncertain, ambiguous, or subject to more than one interpretation. Applying the holding in *Morin*, we find no error of law, as the record supports this interpretive decision because the Release is subject to more than one reasonable interpretation.

One reasonable interpretation supports Ms. Brafa's explanation. The Purchase Agreement contains a forfeiture clause whereby the Christs could retain the $500.00 deposit in the event the Murphys failed to timely close the sale. Therefore, it was necessary for Ms. Brafa to obtain the Christs' consent to return the deposit. The Release accomplished this result in that it explicitly authorized the release of the deposit to the Murphys. However, it went much further. It specifically recognized that the Christs did not intend to accept the Murphys' new offer and would not grant an extension of the closing date set forth in the April 22 Purchase Agreement, that they released all of the parties to the April 22 agreement, that they no longer intended to sell their home, and that they "would like to remove it from the market." None of this additional language was necessary to effect the release of the deposit.

6

While this unnecessary language did not explicitly terminate the Listing Agreement, it is a reasonable interpretation that its intent was to do so. When Ms. Brafa incorporated this extra language into the Release, she clearly recognized in writing what she had been told by the Christs regarding their intent to withdraw from the Listing Agreement. By preparing the Release with the included language, and by signing it herself, it could reasonably be interpreted that Ms. Brafa gave her approval to the Christs' desire to remove the property from the market. If the intent were only to release the deposit, all of the other recitations and her signature were totally unnecessary to effect the Release, as she was not even a party to the Purchase Agreement. She was aware of the efforts and the expense the Christs put out to meet the closing date, their disappointment when the sale could not be closed, and their frustration when she could not assure them of a speedy closing. It would have been altogether understandable for her to have decided on June 5 to terminate the Listing Agreement and turn her efforts toward finding the Murphys "another property," as suggested in the Release itself. Obviously, she wanted to help the Murphys and acceding to the desire of the Christs to terminate the listing could have benefited the Murphys if, in doing so, it eliminated the possibility that the Christs might assert their right to recover damages for the breach of the Purchase Agreement.[5]

Having found no legal error in the trial court's determination that the terms of the Release were susceptible of more than one reasonable interpretation,[6] we next

---

[5]The purchase agreement provided that, in the event the Murphys failed to comply with the agreement within the time specified, the Christs would have the right to demand specific performance or, at their option, the right to reoffer the property for sale and declare the deposit, ipso facto, forfeited. Further, the contract provided that, in either event, the Christs would have the right to recover any costs and/or fees, including expenses or commission payments and reasonable attorney fees, incurred as a result of the agreement or the breach thereof.

[6]At the trial, it was not the defendants but Ms. Brafa herself who undertook to explain the intent of the Release by going beyond its four corners. In her testimony in her case in chief, Ms. Brafa's attorney opened the door to the subject matter by asking her the following: "[W]hat was

examine the trial court's interpretation under the manifest error rule. "Where factual findings are pertinent to the interpretation of a contract, those factual findings are not to be disturbed unless manifest error is shown." *Derbes v. GBS Props., LLC*, 04-1460, p. _ (La.App. 5 Cir. 4/26/05), 902 So.2d 1109, 1112. Appellate courts may not set aside a trial court's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." *Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989). Further, where there is conflict in the testimony, the trial court's reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review. *Id.* Where two permissible views of the evidence exist, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. *Id.* Thus, if the trial court's decision is reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though the appellate court would have weighed the evidence differently. *Id.* In applying these general rules to the trial court's factual determinations, we are also mindful of the well-established rule of construction that the ambiguity or contradiction which exists in the language of a contract must be construed against the party who prepared it. La.Civ.Code art. 2056; *Kenner Indus., Inc. v. Sewell Plastics, Inc*, 451 So.2d 557 (La.1984).

In this matter, the trial court was confronted with two versions of the facts. Ms. Brafa testified that the sole purpose of the Release was to effect a return of the Murphys' $500.00 deposit. The Christs both testified that it had the additional purpose of terminating the Listing Agreement.

---

your intent and purpose in having the parties sign this piece of paper?" Similarly, in her appellate brief, Ms. Brafa makes no Louisiana Civil Code art. 2046 argument that the terms of the contract were clear and explicit and that no further interpretation should have been made in search of the parties' intent; rather, her entire argument deals with what her intention was when she wrote the Release.

Mrs. Christ testified that when Ms. Brafa called her and requested that she and her husband come to the office to sign the Release, she informed Mrs. Christ that, by signing the Release, they would be released from everything. Mr. Christ testified that, when he and his wife went to Ms. Brafa's office to execute the release, he specifically raised the termination question and Wilma informed him of the same thing. Ms. Brafa did not deny the statement attributed to her by Mrs. Christ, and Wilma did not testify.

On this record in its entirety, we cannot say that the trial court's evaluations of credibility and reasonable inferences of fact were clearly wrong. Therefore, we find no factual error in the trial court's interpretation of the Release prepared by Ms. Brafa and no error in the trial court's ultimate decision on the merits.

We will mention one last contention of Ms. Brafa, and that is her argument, stated in the form of a question, that if it were her intention to terminate the Listing Agreement by the Release of June 5, why would she have prepared the second Purchase Agreement on June 6? There are two answers to that question. The first is that she was trying to help the Murphys. The Christs were free to enter into a new contract of sale with the Murphys regardless of the existence or nonexistence of a Listing Agreement. The other answer is that Ms. Brafa simply changed her mind. That she changed her mind is demonstrated by the fact that one day she was looking to find "another property" for the Murphys as suggested by the language of the Release, and the next day she was trying to persuade the Christs to reconsider selling their property. It is also demonstrated by the fact that she filed this lawsuit. In any event, the document she wrote and signed on June 5 was the same document the Christs signed on June 16 or 17 at her request and based on her representations as to

its effect. It was this document that the trial court interpreted to be a termination of the Listing Agreement.

## DISPOSITION

For the foregoing reasons, we affirm the trial court judgment. We assess all costs of this appeal to Tammy Brafa, doing business as Magnolia Realty Group.

**AFFIRMED.**