# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 05-0939

**JOHN BLALOCK D/B/A**
**THE BEST LITTLE DOORHOUSE IN TOWN**

**VERSUS**

**KENNETH LORD D/B/A KENNETH LORD**
**INSTALLATION AND CONSTRUCTION**

************

APPEAL FROM THE
THIRTY-FIFTH JUDICIAL DISTRICT COURT,
PARISH OF GRANT, NO. 10,417,
HONORABLE ALLEN KRAKE, DISTRICT JUDGE

************

**JIMMIE C. PETERS**
**JUDGE**

************

Court composed of Jimmie C. Peters, J. David Painter and James T. Genovese, Judges.

**JUDGMENT AFFIRMED IN PART; AMENDED IN PART;**
**REVERSED IN PART; AND CASE REMANDED.**

**Randall B. Keiser**
**Keiser Law Firm, P.L.C.**
**3700 Jackson Street, Suite 102**
**Alexandria, LA 71315-2358**
**(318) 443-6168**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **John Blalock**

**Lewis O. Lauve, Jr.**
**Bussey & Lauve, L.L.C.**
**Post Office Box 307**
**Alexandria, LA 71309-0307**
**(318) 449-1937**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Kenneth Lord**

PETERS, J.

Kenneth W. Lord d/b/a Kenneth Lord Installation and Construction (hereinafter "Lord")[1] appeals two separate judgments rendered in a suit filed against him by John Blalock d/b/a The Best Little Doorhouse in Town (hereinafter "Blalock"). The first judgment, dated February 28, 2000, denied Lord leave to file a reconventional demand against Blalock and a third-party demand against Blalock's brother, Charles Blalock. The second judgment, dated December 21, 2004, awarded Blalock damages in contract against Lord in the amount of $55,899.23 with interest and costs. Blalock has answered the appeal, asserting that the trial court erred in failing to award him general damages, attorney fees, and treble damages based on an alleged violation of the provisions of the Louisiana Unfair Trade Practices Act (hereinafter "LUTPA").

For the following reasons, we amend the December 21, 2004 judgment by reducing the money judgment awarded to Blalock, and we affirm the trial court's denial of Blalock's demands for additional damages and attorney fees. We further reverse the February 28, 2000 judgment prohibiting Lord from filing his reconventional and third-party demands, grant Lord leave to file the demands, and remand the matter for further proceedings associated with these demands.

## DISCUSSION OF THE RECORD

This litigation arises from the interpretation and enforcement of a package of contracts entered into on January 2, 1989, between Blalock on the one hand, and Lord and Charles Blalock[2] on the other. In 1992, Charles Blalock transferred his interest

_____

[1]In all pleadings and in the final judgment rendered in the case, Kenneth Lord is treated as appearing in two capacities, first as Kenneth Lord, individually, and second as Kenneth Lord d/b/a Kenneth Lord Installation and Construction. The designation of Lord and his business as two separate entities was inappropriate. A person doing business under a trade name is the proper defendant against whom to enforce an obligation created by or arising out of the doing of such business. La.Code Civ.P. art. 736.

[2]The wives of these three parties were also parties to some of the contracts in the package, but they played no active roles in the dispute and did not testify at the trial. To simplify the

in the contracts to Lord, and, on December 12, 1994, Blalock filed the instant suit, naming Lord as a defendant.

In the years preceding 1989, Blalock was in the business of selling and installing doors. He sold the doors and insulation under the business name "The Best Little Doorhouse in Town" and installed the doors and insulation under the business name "Professional Installations." Both businesses operated out of the same physical location in Alexandria, Louisiana, and Lord and Charles Blalock worked for him on the Professional Installations side of the business.

The contracts came into existence because Blalock began exploring ways to remove himself from the labor side of the businesses, with an ultimate goal of retirement. To this end, he conceived the idea of selling Professional Installations to Lord and his brother as the first phase of his planned eventual retirement. When Lord and Charles Blalock agreed with the general concept, Blalock asked his CPA, Bruce Melder, and his then attorney, Mark Watson, to structure the necessary transactions to provide him income over a number of years, taking into consideration the appropriate tax consequences.

To that end, Watson prepared six separate documents for execution by the parties. These included one document designated as a "Sale and Mortgage," one designated as an "Agreement," two designated as a "Pledge," one designated as a "Lease," and one designated as a "Contract of Employment." To understand the issues involved in this litigation, one must be aware of the salient features of these documents.

*Sale and Mortgage*

description of the contracts, we refer to the parties as only Blalock, Lord and Charles Blalock.

2

An unsigned copy of this document is attached to Blalock's petition as an exhibit.[3] The document recites that Blalock sold and conveyed to Lord and his brother all right, title and interest in Professional Installations. The transfer specifically included the goodwill of the business and further describes in detail seventeen movables belonging to Professional Installations, including various specialized installation tools, four used vehicles, and a trailer. The recited consideration is $35,000.00 "and other good and valuable consideration." The document further states that the buyers paid $30,000.00 of the recited consideration and provided a $5,000.00 promissory note bearing ten percent per annum interest for the balance. The promissory note is described as payable in monthly payments over a period of ten years. Although unsigned, the copy includes signature lines for Blalock as the "Seller" and Lord and Charles Blalock as the "Buyer."

*Agreement*

The copy of this document found in the record was signed by Blalock, Lord, and Charles Blalock on January 2, 1989. In the text of the Agreement, the three men declared that on that same date they "executed a cash sale and mortgage conveying title" from Blalock to Lord and Charles Blalock to all of his "rights, title and interest, including Good Will, to the name Professional Installations" as well as the same movable property described in the Sale and Mortgage. The Agreement restates the consideration as being that described in the Sale and Mortgage and explains that the "other consideration" referred to in the Sale and Mortgage consists of an agreement by the purchasers to pledge up to $5,000.00 of their equity in their personal

---

[3]The designation "Sale and Mortgage" as the descriptive title of this instrument was because a clerk's form for the document was used to prepare it. No mortgage copy was produced, and there was no testimony at trial that a mortgage was either executed or contemplated.

residences as security for the balance due on the $35,000.00 purchase price and the following agreement:

> So long as JOHN BLALOCK remains living, then on January 1, 1994, JOHN BLALOCK, d/b/a BEST LITTLE DOOR HOUSE, agrees to convey all the assets (excluding real estate), and liabilities of BEST LITTLE DOOR HOUSE, including improvements thereon, and cash on hand, to CHARLES ROY BLALOCK; ELIZABETH ANN BLALOCK; KENNETH WAYNE LORD; and DEBRA ALFORD LORD, according to the following terms and prices, contingent upon the borrowers complete and total repayment of the financed portion of the sale of PROFESSIONAL INSTALLATIONS and, further, provides that the lease entered into on even date between purchasers and sellers has, also, been paid in full. On January 1, 1994, the price for this sale will be TWO HUNDRED THOUSAND AND NO/100 ($200,000.00) DOLLARS. Thereafter, the sale price will increase at an annual percentage rate of 6%, compounded annually.
>
> In the event of JOHN BLALOCK'S death, the parties agree that borrowers may exercise the option to purchase BEST LITTLE DOOR HOUSE at any time prior to and including January 1, 1994 at a price of TWO HUNDRED THOUSAND AND NO/100 ($200,000.00) DOLLARS. After January 1, 1994, the price will increase at an annual percentage rate of six percent (6%), compounded annually.

Blalock signed the agreement as "Seller," and Lord and Charles Blalock each signed as "Buyer."

### Pledges

The individual Pledges referred to in the Agreement appear in the record and recite the same terms set forth in the Agreement. That is to say, Lord and Charles Blalock each pledged $5,000.00 of the equity in their respective homes to secure the payment of the promissory note mentioned in the Sale and Mortgage and in the Agreement. Lord and Charles Blalock executed these document on January 2, 1989.

### Lease

By the Lease, Blalock leased Lord and his brother one-third of the physical space comprising the commercial premises occupied by his two businesses. The Lease has a term of twelve years beginning January 2, 1989; provides for a monthly

4

rent of $750.00 for the first ten years and $625.00 during the last two years; and includes a default clause which provides that in the event the lessees fail to pay the rent on time, the lessor could accelerate the remaining installments, terminate the lease, and collect a twenty-five percent attorney fee based on the amount of unpaid rent. It also includes a clause which ties it to the Contract of Employment described hereafter by providing that if the Contract of Employment is cancelled, such action will automatically "render this Lease invalid." Blalock signed this lease as "Lessor," and Lord and Charles Blalock each signed it as "Lessee."

*Contract of Employment*

The Contract of Employment designates Blalock as an employee of Professional Installations and Lord and Charles Blalock as its new owners. In describing Blalock's employment obligations, the contract provides that he would solicit jobs for Professional Installations, which in turn would serve as the "exclusive installer of all doors, garage doors, etc." sold by Blalock through The Best Little Doorhouse. With regard to compensation, it provides:

> Employer agrees to pay Employee, as a fee for rendering such services:
> (a)  25% of the gross amount received on all insulation jobs procured;
> (b)  35% of the gross amount received on all other jobs procured by Employee and accepted by Employer . . . .

The Contract of Employment further provides that, in the event Blalock began doing business in any other name, the employment contract would be automatically reformed to include the new business and that if he stopped doing business or sold The Best Little Doorhouse, the employment contract would be "null and void." The signatures of Blalock, Lord, and Charles Blalock appear at the end of this document.

5

Watson appears as the notary on all of five of the documents that were admittedly signed on January 2, 1989. Immediately after January 2, 1989, Lord and Charles Blalock paid a $30,000.00 bank note owed by Blalock,[4] took possession of the leased premises and the equipment described in the Sale and Mortgage and Agreement, and began doing business side by side with Blalock in his Alexandria business location. However, despite using The Best Little Doorhouse telephone number on their business stationary, Lord and Charles Blalock never used the name "Professional Installations" in their business. Instead, they did business as K & C Construction until Lord purchased Charles Blalock's interest in 1992. Thereafter, Lord operated his business as Kenneth Lord d/b/a Kenneth Lord Installation and Construction.

Neither Lord nor Charles Blalock exercised the option available to them on January 1, 1994.[5] This litigation arises because, on October 20, 1994, Blalock unilaterally terminated the entire relationship between himself and Lord by writing Lord a letter, the text of which is set forth in full as follows:

> For the best interest of The Best Little Doorhouse in Town, John W. Blalock and all concerned parties, your services, contract and agreement, either implied or not, are hereby terminated as of October 20, 1994.
>
> Your lease on part of the building at 3219 Masonic Drive in Alexandria, LA, will expire on October 20, 1994. You are hereby instructed to remove all your personal effects from these premises immediately.
>
> The trade name, Professional Installation [sic], will remain in the possession of John W. Blalock. Any and all advertising will also remain in possession of John W. Blalock. The telephone number, (318) 445-9132, is to be removed, at once, from all stationery, checks, business

---

[4]The parties agreed at trial that the payment of this bank note satisfied the $30,000.00 down payment of the purchase price as described in the various documents at issue.

[5]Blalock does not dispute the fact that, on January 1, 1994, both Lord and his brother had timely complied with all payment terms owed by them under the package of contracts entered into on January 2, 1989.

cards, handout literature or any other business paraphernalia in your possession and shall not be used by you in any way, shape or form.

In addition, your balance on the promissory note is $2,649.23. I hereby demand its balance in full on October 20, 1994. In lieu of this payment of $2,649.23, the trade of the insulation machine, trailers, hoses in good workable condition, etc. would be accepted as full payment of said promissory note.

If, in the future, your services are required, they will be procured on a job-by-job basis.

On the date that this letter was written, Lord was still current on the payments on the promissory note as well as the rent due under the Lease.

Upon receipt of the letter, Lord immediately vacated the leased premises, and, by correspondence dated October 21, 1994, Blalock's attorney advised Lord that Blalock would refund him $250.00, being the balance of the October rent which Lord had timely paid on the first of the month. The letter also acknowledged that Blalock owed Lord $2,798.08 under the terms of the Contract of Employment[6] and, at the same time, made formal demand on Lord for unspecified amounts allegedly due Blalock under the Contract of Employment for payments received by Lord on jobs procured by Blalock from the inception of the agreement through its termination. It further acknowledged that Blalock would not resume use of the Professional Installations name "from this date forward"[7] and that "the promissory note is not due and exigible at this time and [he] is content to accept monthly payments according to the terms of the note and pledge agreement." Thereafter, Lord ceased making any payments to Blalock, either under the Lease or pursuant to the promissory note.

---

[6]Under their arrangement, Blalock collected payment for the total price of the jobs he procured and Lord installed. He then retained what was due him and sent Lord the balance. As of October 20, 1994, Blalock held $2,798.08 that belonged to Lord.

[7]This letter seemingly reversed Blalock's position he had taken the day before. On October 20, Blalock had declared that the trade name, Professional Installations, would "remain" in his possession.

Blalock filed suit against Lord on December 12, 1994, seeking to recover the balance due on the $5,000.00 promissory note, the accelerated balance due under the Lease, and sums due under the Contract of Employment,[8] as well as general and special damages, penalties and attorney fees under LUTPA. On June 15, 2004, or over nine years after suit was filed and over fifteen years after confection of the contracts at issue, this matter went to trial.

At trial, Blalock testified that he took action to dissolve the business relationship because that relationship had begun to deteriorate soon after Lord purchased Charles Blalock's interest in 1992 and became unacceptable when Lord advised him that he was not going to exercise the option to purchase The Best Little Doorhouse because he construed that portion of the package of contracts as an agreement to purchase, not an option to purchase. Blalock testified that he became more dissatisfied when he learned that Lord was installing doors sold by others, an action he believed to be contrary to the implied understanding of the parties despite the fact that nothing in any of the contracts prohibited Lord from installing doors sold by others.

Blalock maintained in his testimony that the sale price of Professional Installations was $140,000.00, not $35,000.00 as recited in the Sale and Mortgage. He explained that the $105,000.00 difference between the two amounts was the amount he expected to receive from the rental of the business premises over the twelve-year period. Blalock testified that he was paid $30,000.00 initially, that he has received $2,350.77 in principal payments on the $5,000.00 note and $51,750.00 in rent payments through October 20, 1994, for a total of $84,100.77. Thus, according

___

[8]At trial, Blalock offered no evidence to substantiate the claim for compensation under the Contract of Employment and has apparently abandoned that claim on appeal.

to his calculations, Lord owed him the principal balance of the promissory note, or $2,649.23, and the balance of the rent for the twelve-year lease, or $53,250.00, for a total of $55,899.23. Additionally, Blalock asserted that Lord's actions violated LUTPA and that he was entitled to general damages, treble damages in the amount of $167,697.69 (three times $55,899.23), and attorney fees of $41,924.42 (twenty-five percent of $167,697.69). The demand for LUTPA treble damages and attorney fees was based on the argument that Lord did "'off the book' jobs in derogation of the arrangement expressed in the documents" and that he used The Best Little Doorhouse's phone number (which was also the phone number for Professional Installations) in the conduct of his "off the book" or competing business.

Lord disagreed with Blalock's interpretation of the effect of the package of contracts and suggested that the documents should be interpreted as written. According to Lord, the Sale and Mortgage together with the Pledges represented the sale of Professional Installations and the other documents were merely additional contracts relating to the business relationship. By those two documents, according to Lord, he purchased the name, movable assets, and goodwill of Professional Installations, and nothing else. However, because he did not consider there to be any goodwill in Professional Installations, he chose not to do business in that name.

Lord further acknowledged that the remaining documents were designed to provide Blalock with a steady flow of income while, at the same time, providing Lord with a workplace and a steady flow of installation business generated by Blalock. He rejected Blalock's assertion that there was any implied contract prohibiting him from installing doors other than those sold by The Best Little Doorhouse. The provision

9

in the Lease requiring termination if the Contract of Employment was terminated, according to Lord, was placed in the document for his protection.

The testimonial contribution of the remaining witnesses concerning the actual sale price was ambivalent. Charles Blalock testified by deposition, and his memory of the entire matter was less than sharp.

Melder testified that, as Blalock's certified public accountant, he structured the overall transaction such that Blalock would receive an income over a period of twelve years and suggested that the Lease doubled as a lease and also as part of the payoff of the purchase price. He acknowledged that Blalock paid no taxes on the $35,000.00 sale price because that amount represented the exact net book value of the equipment belonging to Professional Installations. He further acknowledged that, at the time of the transfer, Professional Installations was not making any money. The rent, according to Melder, was "what bridged the gap" and represented the value of the use of the building and the right to be Blalock's exclusive installer.

Watson testified that he prepared the documents on the concepts generated by Melder and described the package of transactions as "a sale disguised as a lease." He suggested that Blalock never intended to lease space to Lord for him to use to compete with The Best Little Doorhouse. However, he acknowledged that the specific issue was not addressed by the package of contracts.

## TRIAL COURT'S REASONS FOR JUDGMENT

In reasons for judgment, the trial court found it to be "undisputed that the parties enjoyed some type of business relationship until [Blalock] unilaterally terminated any and all such relationships by the letter drawn by his hand on October 20, 1994." The trial court saw the issue as being "whether the *four* documents . . .

signed on January 2, 1989 . . . were actually all structured as a 'real' sale or as a lease." (Emphasis added.) In addressing that issue, the trial court concluded "that the intent of all parties involved in the drafting and signing of the four original documents of January 2, 1989 as well as all future impressions and understanding thereto by the parties was to duly SALE [sic] Professional Installations."  Having reached that conclusion, the trial court awarded Blalock judgment against Lord in the amount of $55,899.23 as the unpaid portion of the purchase price.  However, the trial court rejected Blalock's claim for general damages, LUTPA damages, and attorney fees.

### ISSUES ON APPEAL

On appeal, Lord assigned several errors, including the trial court's refusal to allow him to file a reconventional demand against Blalock and a third-party demand against Charles Blalock.  Lord's remaining assignments of error as well as Blalock's assignments of error found in his answer to the appeal relate to the judgment on the merits.

We find that the merit assignments raised by Lord pose the following questions:

(1) Did the parties execute the Sale and Mortgage?

(2) What was the sale price of Professional Installations?

(3) When did the sale take effect?

The merits issues raised by Blalock in his answer to the appeal likewise pose three questions:

(1)  Is Blalock entitled to attorney fees?

(2)  Is Blalock entitled to general damages?

11

(3) Is Blalock entitled to LUTPA damages?

**OPINION**

*ON THE MERITS*

The standard of review governing our consideration of issues of fact is well settled. An appellate court may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. *Rosell v. ESCO*, 549 So.2d 840 (La.1989). In order to reverse a fact finder's determination of fact, an appellate court must review the record in its entirety and meet the following two-part test: (1) find that a reasonable factual basis does not exist for the finding and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. *Stobart v. State, Through Dep't of Transp. & Dev.*, 617 So.2d 880 (La.1993). On review, an appellate court must be cautious not to reweigh the evidence or to substitute its own factual findings just because it would have decided the case differently. *Ambrose v. New Orleans Police Dep't Ambulance Serv.*, 93-3099, 93-3110, 93-3112 (La. 7/5/94), 639 So.2d 216. However, the supreme court clarified in *Ambrose* that its purpose in *Stobart* was not "to mandate that the trial court's factual determinations cannot ever, or hardly ever, be upset." *Id.* at 221. Recognizing that great deference should be accorded to the fact finder, the court of appeal and the supreme court nonetheless have a constitutional duty to review facts. *Id*. "To perform its constitutional duty properly, an appellate court must determine whether the district court's conclusions were clearly wrong based on the evidence or are clearly without evidentiary support." *Hornsby v. Bayou Jack Logging*, 04-1297, p. 8 (La. 5/6/05), 902 So.2d 361, 367. "Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or

implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination." *Rosell*, 549 So.2d at 844-45.

*ISSUES RAISED BY LORD*

**(1) Did the parties execute the Sale and Mortgage?**

In its reasons for judgment, the trial court did not consider the Sale and Mortgage. Thus, the trial court obviously concluded that it had not been signed and therefore was not a part of the package of contracts entered into on January 2, 1989. We find that the trial court erred in reaching this conclusion.

The record establishes that, although Blalock testified at trial that he did not recall signing it, it was he who attached a copy of the Sale and Mortgage to his original petition with the other documents. Additionally, he had testified in a deposition taken four years before trial that it had been executed. Lord testified that all of the parties did sign it, while Charles Blalock simply could not remember. Despite this conflicting testimony, the Agreement, which was unquestionably executed by all the parties, was an affirmation of the Sale and Mortgage. It stated that "[o]n this date [Blalock, Lord, and Charles Blalock] have executed a cash sale and mortgage conveying title." Furthermore, it repeated the significant language of the Sale and Mortgage, including the consideration of the sale and a full itemized description of the things sold. Affirmation of the sale in the Agreement leaves no doubt that there was in fact a contract executed according to the terms and conditions as recited in the Sale and Mortgage. Thus, the documents, objective evidence, and other testimony so contradict Blalock's testimony that it cannot be credited. *See id.*

13

**(2) What was the sale price of Professional Installations?**

We agree with the trial court's conclusion that the documents executed on January 2, 1989, were a package. However, the trial court erred when it concluded that it was only a package sale, as the documents envisioned both a sale and other consequences.

On appeal, Blalock argues that it was the understanding of all parties involved that the payments and obligations under the documents were made in exchange for the sale of Professional Installations. However, this argument ignores the effect of the Sale and Mortgage as well as the Contract of Employment.[9] Having concluded that the Sale and Mortgage was in fact a part of that package, we must reevaluate the package of contracts and determine the impact that the document has on the interpretation of the package.

Contracts have the force of law between the parties, and the courts are bound to interpret them according to the common intent of the parties. La.Civ.Code arts. 1983 and 2045. If the words of the contract are clear, unambiguous, and lead to no absurd consequences, the court need not look beyond the contract language to determine the true intent of the parties. La.Civ.Code art. 2046. In *Armand v. Belt*, 01-0051, pp. 2-3 (La.App. 3 Cir. 5/16/01), 799 So.2d 507, 508, *writ denied*, 01-1764 (La. 10/5/01), 798 So.2d 970, we stated that contractual relations between parties must be evaluated by applying the interpretive rules of contracts as found in the Louisiana Civil Code and further stated:

> The interpretative purpose is to determine the common intent of the parties. La.Civ.Code art. 2045. In attempting to determine that common intent, we may not seek a different interpretation "[w]hen the words of

---

[9]Blalock's brief does not discuss how the payments and obligations under the Contract of Employment figured into the "exchange for the Sale."

14

a contract are clear and explicit and lead to no absurd consequences." La.Civ.Code art. 2046. Words within a contract "must be given their generally prevailing meaning." La.Civ.Code art. 2047. However, if words of a contract are susceptible of different meanings, we must interpret them in the manner that "best conforms to the object of the contract." La.Civ.Code art. 2048. A single provision of [a] contract "must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." La.Civ.Code art. 2050. We are required to interpret a doubtful provision "in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties." La.Civ.Code art. 2053. Additionally, where the doubt created by a contract provision cannot be removed, we must interpret that provision against the party who furnished it. La.Civ.Code art. 2056.

An appellate court's review of questions of law is simply to determine whether the trial court was legally correct or legally incorrect in its determination. *Citgo Petroleum Corp. v. Frantz*, 03-0088 (La.App. 3 Cir. 6/4/03), 847 So.2d 734, *writ denied*, 03-1911 (La. 10/31/03), 857 So.2d 484. The question of ambiguity in a contract is a matter of law, and the correct standard for review is that which is appropriate for review of legal error. *Morin v. Foret*, 98-0120 (La.App. 3 Cir. 4/14/99), 736 So.2d 279, *writ denied*, 99-2022 (La. 10/29/99), 748 So.2d 1165.

Applying these rules of interpretation to the package of contracts at issue, we first note that the Sale and Mortgage states that Lord and Charles Blalock purchased the business enterprise owned by Blalock and operated by him as Professional Installations. Specifically, they purchased the name and goodwill of that business enterprise as well as certain movables belonging to Blalock and used by him in that business. It further describes the sale price as $35,000.00 "and other good and valuable consideration." The contemporaneously executed Agreement recites that the other good and valuable consideration referred to in the Sale and Mortgage consisted of only two things, the Pledges and the option to purchase The Best Little Doorhouse.

The remaining documents comprising the package of contracts make no mention of any other consideration associated with the transfer of ownership. Thus, the language of the package of contracts clearly and unambiguously establishes the purchase price of Professional Installations as $35,000.00. This purchase price was a reasonable price given the testimony of Melder concerning the net book value of Professional Installations' movable property and its financial difficulties at the time and considering Lord's testimony that the goodwill of Professional Installations had no real value. Thus, this interpretation of the package of contracts leads to no absurd conclusions.

The remaining documents were equally clear and unambiguous in their intent. The two Pledges satisfied a portion of the "other good and valuable consideration" requirement of the Sale and Mortgage as elaborated on in the Agreement by providing security for the unpaid amount of the purchase price. The Lease provided Lord and Charles Blalock with work space in which to operate their newly acquired business, and the Contract of Employment gave Blalock a percentage of the revenue Lord and Charles Blalock earned by installing doors, insulation, or other things sold by Blalock through his remaining business, The Best Little Doorhouse.

Nevertheless, Blalock contended that the Lease was a disguised part of the sale and that it represented an additional $105,000.00 of the sale price. In other words, Blalock contended that the Lease was a simulation.

"A contract is a simulation when, by mutual agreement, it does not express the true intent of the parties." La.Civ.Code art. 2025. There are two types of simulations: absolute and relative. In an absolute simulation, which is sometimes called a pure simulation or non-transfer, the parties do not intend that their contract

16

will have an effect between them. La.Civ.Code art. 2026. When the parties intend their contract to produce effects between them that are different from those recited in their contract, it is a relative simulation. La.Civ.Code art. 2027. "A relative simulation produces between the parties the effects they intended if all requirements for those effects have been met." La.Civ.Code art. 2027.

While not specifically calling it such, it appears that the trial court found that the Lease was a relative simulation as it concluded that the effect the parties intended differed from that recited in the instrument. That is to say, the effect was not the lease of the building space but an additional part of the sale of Professional Installations. We say that it appears that the trial court reached this conclusion because there exists no other explanation for allowing the Lease to be unilaterally cancelled by Blalock while at the same time requiring Lord to continue to make the monthly payments for the next seven years.

Generally, "[t]estimonal or other evidence may not be admitted to negate or vary the contents of an authentic act or an act under private signature." La.Civ.Code art. 1848. However, such evidence may be admitted to prove that such an act is a simulation. *Id.* Thus, the trial court properly admitted parol evidence and considered it for that purpose. The issue of whether an act is simulated is an issue of fact. *Ridgedell v. Succession of Kuyrkendall*, 98-1224 (La.App. 1 Cir. 5/19/99), 740 So.2d 173. Because a resolution of the simulation dispute depended on factual findings, the standard of our review of this issue is that of manifest error. *Pelican Outdoor Adver., Inc. v. Eugene*, 01-94 (La.App. 5 Cir. 4/24/01), 786 So.2d 184, *writ denied*, 01-1518 (La. 8/31/01), 795 So.2d 1214.

Everyone involved in planning, preparing, and implementing the package of contracts at issue understood that Blalock's ultimate plan was to retire. Of the five witnesses who testified concerning the Lease, Watson testified that he prepared the document on the concepts generated by Melder. Charles Blalock made no comment with regard to his intent, and Melder testified that it was intended to be both a lease and sale. Thus, the testimonial evidence regarding this issue came down to essentially that of the parties, Blalock and Lord. Blalock said it was a simulation, and Lord said it was not.

The testimony on the issue does not stand alone in the record, and we find that the other documentary evidence contradicts Blalock's testimony and establishes that the Lease was not a disguised sale but rather it was exactly what its title indicated—a lease.

"A lease is a synallagmatic contract by which one party, the lessor, binds himself to give to the other party, the lessee, the use and enjoyment of a thing for a term in exchange for a rent that the lessee binds himself to pay." La.Civ.Code art. 2668. A sale is a contract whereby a person transfers ownership of a thing to another in return for a price in money. La.Civ.Code art. 2439. "The thing, the price, and the consent of the parties are requirements for the perfection of a sale." *Id.* As previously stated, the package of contracts does establish that Blalock sold Professional Installations to Lord and Charles Blalock. The same package of contracts establishes that Blalock leased one-third of the commercial premises in Alexandria. Based on the clear and unambiguous language of the package of contracts, the thing he sold was not the same as the thing leased.

18

When the trial court allowed Blalock to cancel the Lease and at the same time recover the full future balance owed under the Lease as a disguised purchase price, it was tantamount to a finding that Lord's occupancy of the Alexandria premises for over five years was a gratuity. Such a finding was inconsistent with the objective facts. Not only did the parties effectively treat the Lease as a lease of the premises for over five years, but also after Blalock wrote Lord the October 20, 1994 letter ordering him to vacate the premises, he continued to treat it as a lease because the next day his attorney wrote Lord and informed him that Blalock had agreed to refund the unearned part of the October rent which Lord had paid at the first of the month. This very act was inconsistent with Blalock's trial testimony and present argument that the transaction was a sale disguised as a lease.

Furthermore, Melder testified that the Lease "doubled" as a lease and as a sale. This was an apt layman's description because it was wholly a lease, and at the same time it provided Blalock with what Melder testified was a "bridge[]" over the "gap" that was desirable as income for the years following a reduction of his work responsibilities.

Finally, and even assuming the Lease language to be ambiguous (and we do not construe it as such), it must be kept in mind that Blalock furnished the text. By substituting its own definitions for the essential provisions of the contracts between the parties, the court violated the contrary instructions of La.Civ.Code art. 2056 to construe doubt against the party who furnished the text. *See Terra Cotta's Cafe, LLC v. Poole*, 05-191 (La.App. 3 Cir. 6/1/05), 904 So.2d 918.

Simply stated, this lease was not a simulation. It was meant to produce effects, and it expressed the true intent of the parties. Louisiana Civil Code Article 2025

19

requires a "mutual agreement" of the parties to the contract to create a simulation, and Blalock failed to prove such an agreement and, in doing so, failed to establish that the purchase price of Professional Installations was anything more than the $35,000.00 stated in the Sale and Mortgage and Agreement. Therefore, the trial court erred in concluding that the Lease payments were part of the purchase price.

The trial court correctly found, however, that Lord owed the balance of the price, as he did not pay the installments on the note after October 1, 1994. The trial court correctly found that the date of maturity was accelerated and the principal balance, $2,649.23, became due.

**(3) When did the sale take effect?**

The trial court found that the parties intended that the name and property of Professional Installations would be conveyed to Lord after the terms of the sale were fulfilled, *i.e.*, after the purchase price had been fully paid. In other words, the trial court concluded that the package of contracts effected a conditional sale. This conclusion is error as a matter of law.

In Louisiana, "[o]wnership is transferred between the parties as soon as there is agreement on the thing and the price is fixed, even though the thing sold is not yet delivered nor the price paid." La.Civ.Code art. 2456. Once the parties have agreed on the thing and the price, the sale is complete. *Hewitt v. Safeway Ins. Co. of La.*, 01-0115 (La.App. 3 Cir. 6/6/01), 787 So.2d 1182. Because Louisiana does not recognize the common law conditional sales contract for movable property, the parties cannot validly agree that the seller will retain title to the object until payment of the purchase price. *Id.*; *see also Montz v. Theard*, 01-0768 (La.App. 1 Cir. 2/27/02), 818 So.2d 181. The same would hold true even if the Lease had been a

20

disguised sale. See *Howard Trucking Co. v. Stassi*, 485 So.2d 915 (La.), *cert. denied*, 479 U.S. 948, 107 S.Ct. 432 (1986), a case in which the court found that a series of documents styled as leases of vehicles and oilfield equipment was actually a prohibited conditional sales agreement with the result that the leases amounted to a sale and title passed at the time of the sale. Thus, we find that the sale was effective January 2, 1989, and title to the property sold passed on that date.

### ISSUES RAISED BY BLALOCK

The trial court rejected Blalock's demands for damages in tort as well as damages and attorney fees under LUTPA. In doing so, the trial court concluded that the damages were both "unsubstantiated" and "mainly attributable" to Blalock's unilateral termination of the "working relationship" between himself and Lord.

**(1) Is Blalock entitled to attorney fees?**

Blalock complains on appeal that the trial court erred in not awarding him $13,312.50 as attorney fees on the amount awarded under the Lease contract.[10] We find no merit in this assignment of error.

As we have already discussed, the Lease was just that, a lease. Blalock's unilateral termination of the Lease precludes him from recovering attorney fees. Louisiana Civil Code Article 2013 provides that "[w]hen the obligor fails to perform, the obligee has a right to the judicial dissolution of the contract or, according to the circumstances, to regard the contract as dissolved." These circumstances gave Lord the right to regard the contract of lease as dissolved. Lord's acquiescence in the

---

[10]The amount of attorney fees Blalock asks for on appeal is different from that requested in the trial court. In his post-trial memorandum in the trial court, Blalock asked for treble damages under LUTPA of $167,697.69 (three times $55,899.23) and attorney fees of $41,924.42 (twenty-five percent of the treble damages demand).

21

eviction manifested the exercise of that right. Thus, the trial court did not err in rejecting Blalock's claim for attorney fees.

**(2) Is Blalock entitled to general damages?**

As we have previously discussed, the only failure on the part of Lord was his failure to continue to pay the balance on the $5,000.00 obligation, and that failure is not a delict giving rise to general damages. Thus, this assignment has no merit.

**(3) Is Blalock entitled to LUTPA damages?**

Blalock's stated legal ground relative to this claim is that LUTPA declares unfair methods of competition as well as unfair or deceptive acts or practices in the conduct of any trade or commerce to be unlawful. He asserts that Lord secretively engaged in a business which directly competed with The Best Little Doorhouse operation. Specifically, he asserts that Lord created Kenneth Lord Installation and Construction to act in competition with The Best Little Doorhouse and that he funneled jobs referred to Professional Installations through his business to avoid paying Blalock the percentage due under the Contract of Employment.

We find no error in the trial court's rejection of the LUTPA claim. We have noted that the trial court rejected the claim for LUTPA damages for the dual reasons that it was unsubstantiated and that any damages were caused by Blalock's own initial unilateral action. Without agreeing that Lord's actions, if proved, might have been an unfair trade practice, we will rest our decision that this assignment has no merit on our agreement with the trial court that the LUTPA claim was unsubstantiated, *i.e.*, the plaintiff failed to prove the factual basis alleged.

Blalock asserted in his pleadings that between December 1993 and October 1994, Lord had failed to pay him $22,609.50 under the Contract of Employment.

22

However, Blalock presented no evidence of this specific amount at trial and has basically abandoned this claim on appeal. Instead, on appeal, he ignores the lack of proof on this claim and suggests that the LUTPA treble damages should be based on the $55,899.23 trial court award which related to the business sale issue. He bases this on the argument that Lord's conduct in running a competing business resulted in his not receiving the scheduled payments for the purchase of Professional Installations through the Lease. He claims that operating the competing business was an unfair trade practice and that the damage resulting from the unfair trade practice was the cessation of the Lease and his entitlement to the amount awarded by the trial court.

We have already addressed the trial court error in awarding the damages that Blalock now asserts represents his entitlement to LUTPA treble damages. We further note that Blalock and Lord were never in competition. Lord did not sell doors, and Blalock did not install doors. Further, there was no contractual provision that forbade Lord from installing doors sold by others. In fact, there is no evidence that Lord's installation of products of Blalock's competitors hurt Blalock's business in any manner. Under the clear and unambiguous language of the Contract of Employment, Blalock was entitled to only the stated percentage on jobs *procured* by Blalock for Lord. This assignment is without merit.

*THE PROCEDURAL ISSUE*

Louisiana Code of Civil Procedure Article 1033 sets the delay for filing incidental actions, such as reconventional and third-party demands, and provides:

> An incidental demand may be filed without leave of court at any time up to and including the time the answer to the principal demand is filed.

23

> An incidental demand may be filed thereafter, with leave of court, if it will not retard the progress of the principal action, or if permitted by Articles 1066 or 1092.

> An incidental demand that requires leave of court to file shall be considered as filed as of the date it is presented to the clerk of court for filing if leave of court is thereafter granted.

In the present case, La.Code Civ.P. arts. 1066 and 1092 are not applicable.

From a reading of La.Code Civ.P. art. 1033, it is clear that, unless otherwise permitted, an incidental demand may be filed after answer only if leave of court is first obtained and the filing will not retard the progress of the principal action. *Herb's Mach. Shop, Inc. v. John Mecom Co.*, 426 So.2d 762 (La.App. 3 Cir.), *writ denied*, 430 So.2d 98 (La.1983). A court has broad discretion in deciding whether to allow an incidental demand to be filed. *Volume Shoe Corp. v. Armato*, 341 So.2d 611 (La.App. 2 Cir. 1977).

Lord sought leave of court to file the reconventional demand and third-party demand in February 2000, or long after answer had been filed. In the reconventional demand, he requested an award of damages against Blalock for lost installation business as a result of Blalock's breach of the Contract of Employment by providing him no installation work after October 20, 1994; for judgment against Blalock for the $2,798.08 for work performed and admittedly owed by Blalock; and for the refund of $250.00 for the prepaid rent for October 1994, which Blalock at one point acknowledged was due. Lord argued in the trial court that he took this action after learning from Blalock's January 2000 deposition that he [Blalock] planned to expand his lost income damages claim to cover an additional percentage not included on the invoices and also to include invoices dating not just from December 1993 but all the way back from January 2, 1989. Because this period would have included a time

24

when Charles Blalock was involved, Lord also sought permission to file a third-party demand against him.

Blalock opposed the filings, arguing in the trial court that the matter had been pending for more that five years and the proposed filings were a delay tactic. The trial court denied Lord's request for leave to file these incidental demands, and, although written reasons were requested, the trial court provided none. Because Lord satisfied the first requirement by seeking leave of court to file the incidental actions, this court must assume that the trial court concluded that the filings would retard the progress of the principal demand.

Although the litigation had been pending for over five years, it does not appear from the record that Lord caused the delay in bringing it to trial. Allowing these pleadings would not have delayed the progress of the principal action, as time has never been a substantial factor in this litigation. At the time Lord sought leave of court, trial was set for March 21, 2000. However, Blalock had filed a motion for a continuance of that trial date two weeks before the hearing on Lord's motion. The court granted the motion for continuance and set a new trial date in August of 2000, as a second fixing. As the record reflects, the trial was not conducted until 2004.

Allowing Lord to file his incidental actions would not have retarded the progress of the principal action nor would it have prejudiced Blalock. Blalock's indebtedness to Lord for $2,798.08 was admitted in Blalock's own petition. Whether the Lease was a simulated sale was the major issue in the main demand, and it was likewise an issue in determining Blalock's possible liability raised in the reconventional demand. It would have served judicial economy to have allowed the reconventional demand, and allowing the third-party demand would have injected no

25

additional issue into the case. For these reasons, on remand Lord should be allowed to file his incidental demands.

## DISPOSITION

For all the reasons assigned above, that portion of the trial court judgment granting John Blalock a judgment against Kenneth Lord in the amount of $55,899.23 is amended to grant him judgment in the amount of $2,649.23. We further amend the trial court judgment to provide that the costs of the proceedings in the trial court are taxed equally between John Blalock and Kenneth Lord. The trial court judgment denying Kenneth Lord leave of court to file a reconventional demand against John Blalock and a third-party demand against Charles Blalock is reversed, and leave of court is granted. The matter is remanded to the trial court for the filing of these incidental demands and for further proceedings with regard to these demands. We affirm the balance of the trial court judgment and tax all costs of this appeal to John Blalock.

**JUDGMENT AFFIRMED IN PART; AMENDED IN PART; REVERSED IN PART; AND CASE REMANDED.**