STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

08-1378

MARY MARGARET ALEXANDER

VERSUS

LAFAYETTE PARISH SCHOOL BOARD

**********
APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. C-20073608
HONORABLE JOHN DAMIAN TRAHAN, DISTRICT JUDGE

**********

ULYSSES GENE THIBODEAUX
CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, J. David Painter, and
Shannon J. Gremillion, Judges.

AFFIRMED.

J. Isaac Funderburk
Funderburk & Herpin
P. O. Drawer 1030
Abbeville, LA 70511-1030
Telephone:  (337) 893-8140
COUNSEL FOR:
        Plaintiff/Appellant - Mary Margaret Alexander

Jonathan C. Augustine
The Augustine Firm, APLC
8322 One Calais Drive
Baton Rouge, LA 70809
Telephone: (225) 715-7112
COUNSEL FOR:
        Plaintiff/Appellant - Mary Margaret Alexander

Dawn L. Morris
Law Office of Dawn L. Morris
1106 Coolidge Blvd. - Suite A
Lafayette, LA 70503
Telephone:  (337) 704-2094
COUNSEL FOR:
        Defendant/Appellee - Lafayette Parish School Board

**THIBODEAUX, Chief Judge.**

Plaintiff-appellant, Mary Margaret Alexander, filed suit against her former employer, the Lafayette Parish School Board, which fired her for making threatening comments about doing physical harm to co-workers. She sought a declaratory judgment that the school board acted in violation of its polices and procedures in terminating her employment and sought reinstatement of her employment and reimbursement of lost salary and benefits. The trial court denied the claims and dismissed her petition. It reasoned that the school board substantially complied with applicable policy and procedures prior to terminating her employment. We affirm.

I.

## ISSUES

1. Did the trial court correctly determine that the "Allegations of Misconduct Policy" (File: GAEB) set forth the procedure to be applied during the school board's investigation of the alleged threatening comments made by the untenured high school computer proctor, Ms. Alexander?

2. Did the school board substantially comply with the correct policy and afford Ms. Alexander due process during its investigation of her alleged comments prior to her termination?

II.

## FACTUAL BACKGROUND

In 2007, Ms. Alexander was a teacher's assistant employed as the computer proctor at Lafayette Charter High School. On or about January 11, 2007, Ms. Alexander was reprimanded by Mr. Lawrence Lilly, the school's principal, for looking at a newspaper and engaging in casual conversation with another instructor during student class time and in the presence of the students. After the students were

dismissed from the class, the principal spoke with Ms. Alexander in the counselor's office, which was located nearby. During Principal Lilly's conversation with Ms. Alexander, he advised her that the students should have been working and asked that the conduct not happen again.

Later that day, Ms. Alexander angrily told another teacher, Ms. Marilyn Doucet, about the principal's reprimand. About two weeks later, Ms. Doucet reported the conversation to Principal Lilly, stating that Ms. Alexander had made comments to her about doing harm to Principal Lilly and the counselor who had been present during the reprimand. The contents of the written statement she provided to Principal Lilly are as follows:

> Mr. Lilly,
>
> I would like to preface my statement with the following:
>
> It is a common occurrence for Ms. Margaret Alexander to come to my classroom during the dinner break to "let off a little steam." I simply listen patiently as she rants and raves about something that has happened recently at Charter. In so doing, it is my hope that I am helping Ms. Alexander to resolve some of the problems involving her that so very often arise. Additionally, by providing a sort of release for her, it is my hope that I am helping Charter High to operate more efficiently. However, the incident that is described below has frightened me and is certainly beyond my ability to deal with; therefore, after much thought, I have concluded that I must report the episode to you for the safety of all concerned.
>
> 01/22/07
>
> To Whom It May Concern:
>
> On or about January 12, 2007, Margaret Alexander came into my classroom (Room 103) at Lafayette Charter High School during the dinner break to tell me about an incident which had occurred earlier. She had been reprimanded and was upset. In her ranting, she said, "I should bring a gun and shoot off their fucking heads. I'd rather not have to do that. What I'm saying is if they made me mad enough, I would."

2

                    /s/ Marilyn R. Doucet
                    Marilyn R. Doucet

On the day he received the written statement, Principal Lilly immediately reported the incident to Thomas H. Brown, an Area Director for the Lafayette Parish School System. Mr. Brown was the immediate supervisor for twelve principals at the time, including Principal Lilly. His job description included conducting investigations of misconduct. Mr. Brown requested that he and Principal Lilly meet with Ms. Alexander immediately.

The meeting occurred in Principal Lilly's office. Ms. Alexander was presented with Ms. Doucet's statement, and according to Principal Lilly and Mr. Brown, she admitted to making the statements, although she denied any intent to carry out the acts. Both Principal Lilly and Mr. Brown testified that she stated to them that she was "just playing" and "didn't mean it like that." However, based upon her admission of having made the comments, Mr. Brown advised her that she was immediately suspended with pay, pending further investigation. He then escorted her from the building. The incident was also reported to the Lafayette City Police Department.

Principal Lilly called the superintendent, Dr. James Easton, to inform him of the allegations that had been made against Ms. Alexander and of the decision to suspend her with pay, pending further investigation. He also provided a written letter to Superintendent Easton, documenting the reporting of the incident and the action taken. According to Principal Lilly, no further investigation was conducted due to Ms. Alexander's admission that she had made the statements.

Approximately one week later, on January 29, 2007, Principal Lilly sent a letter to Superintendent Easton that recommended Ms. Alexander's termination. He stated in that letter his recommendation was based not only on the shooting threats

she had made but also on her history of exhibiting "hostile" and "strange, erratic behavior," which included "severe mood swings." He further stated that Ms. Alexander had previously been involved in conflicts with other staff members, which included verbal altercations and her making threats to do harm. Principal Lilly concluded that Ms. Alexander's most recent threats against him and the counselor showed that her threats were escalating in severity and constituted unacceptable behavior at the school.

Superintendent Easton spoke with Mr. Brown about the situation and, thereafter, accepted the recommendation to terminate Ms. Alexander. On March 4, 2007, Superintendent Easton issued a letter to Ms. Alexander briefly summarizing Principal Lilly's recommendation that she be terminated and Principal Lilly's reasons offered in support of his recommendation. Superintendent Easton stated that he concurred and advised Ms. Alexander that he would be recommending to the school board that she be terminated at its regularly scheduled meeting of March 21, 2007. He also advised Ms. Alexander in that letter that she had the option of resigning prior to the date of the school board meeting.

Ms. Alexander did not resign but appeared at the school board meeting with legal representation. While in executive session, the school board voted to terminate her employment. On March 28, 2007, she was informed in writing by the school board's Human Resources and Risk Management Director, Ramona Bernard, that her employment was officially terminated as of March 21, 2007.

A few months later, Ms. Alexander filed a Petition for Declaratory Judgment and Writ of Mandamus against the Lafayette Parish School Board, seeking reinstatement of her employment and reimbursement of all salary, benefits, and emoluments of employment that had allegedly been withheld from her. She asserted

4

that she was terminated in violation of the policies and procedures set forth in "File: GCN," entitled "Nonprofessional Personnel Separation." The GCN policy sets forth the procedure to be followed when addressing alleged "deficiencies" in the performance of nonprofessional school board employees.

This case was submitted to the trial court for decision based on the briefs, depositions, and exhibits filed with the trial court. The trial court found that the GCN policy did not apply because it did not address the behavior at issue, although the trial court also found that Ms. Alexander had, nevertheless, been afforded the basic due process rights that the GCN policy's procedures were designed to protect: notice; a chance to respond to charges; the opportunity to resign; a right to have the school board vote on her termination; and notice in writing of the school board's decision.

The trial court found that, due to the allegations that had been made about Ms. Alexander's behavior, a different school board policy, as had been argued by the school board, provided the applicable procedure to be followed. That policy is entitled "Allegations of Misconduct Policy" and is also referenced as "File: GAEB." The GAEB policy addresses the procedure that must be followed when allegations of "misconduct" have been made about any school board employee, regardless of the employee's professional status. After finding this policy to be applicable, the trial court found that the school board substantially complied with its procedures. Consequently, Ms. Alexander's claims were dismissed at her sole cost.

Ms. Alexander has appealed, claiming that the trial court erroneously found that the GAEB policy applied to the facts of her case and also erred in finding that she committed "misconduct" as that term is defined by the GAEB policy. Rather, she claims the GCN policy applied, the school board failed to substantially comply

5

with the procedures set forth therein prior to her termination, and therefore, she was wrongfully terminated.

## III.

## <u>LAW AND DISCUSSION</u>

### *Which School Board Policy Applies?*

This issue of which school board policy applies presents a question of law, requiring this court to decide whether the trial court was legally correct or incorrect in its determination. *See Blalock v. Lord*, 05-939 (La.App. 3 Cir. 2/1/06), 927 So.2d 1142, *writ denied*, 06-124 (La. 9/16/06), 937 So.2d 847 (and cases cited therein). Because these policies are contractual in nature, we are guided by the basic principles of contract interpretation. This means that this reviewing court is bound to interpret them in a manner such that if the words therein are clear, unambiguous, and lead to no absurd consequences, the words must be given their obvious meaning. *See id.*; La.Civ.Code arts. 2046, 2047. The language at issue is not to be disregarded in search of further interpretation or under the pretext of pursuing its spirit. *Id.*

The GAEB policy that was filed in evidence as a joint exhibit states, in relevant part:

> **ALLEGATIONS OF MISCONDUCT POLICY**
>
> . . . .
>
> Upon receipt of an allegation of misconduct, the Superintendent or his designee shall promptly:
>
> > A.  Confer with the principal, administrator, or supervisor of the school, site, or department with which the employee is associated to discuss matters such as the nature of the allegation, whether the performance of the employee has been adversely affected or is likely to be adversely affected, whether others in the school (site) have mentioned this

6

alleged incident of misconduct, the likelihood that the allegation has any veracity, and whether the mere fact that the allegation has been made impairs the abilities of the employee to discharge the duties attendant to his or her position; and,

B. Either personally and/or through a designee (which may be the principal, administrator, or supervisor of the affected employee) attempt to resolve the matter by informal consultation with the involved party or parties.

Based upon the preliminary findings of the Superintendent or his designee, the Superintendent shall decide whether the allegation is without substance or a formal investigation into the complaints initiated and/or the employee [sic] suspended. Should it become necessary for an employee to be suspended during the course of the investigation of the allegation(s) of misconduct, the employee will be suspended with pay until a final decision is made. It is to be noted that up to this point, the investigation should be discreet, on a confidential basis and investigatory, not accusatory in nature. Further, no notations in personnel file of the employee in question shall be made regarding the allegation of misconduct should the Superintendent or his designee elect to discard the charges at this juncture. The investigation shall not become accusatory until the Superintendent or his designee is satisfied that there is a substantial basis for the allegation(s).

After the preliminary formal investigation, the Superintendent or his designee shall advise the affected employee of the Superintendent's preliminary findings. Further, the employee shall be afforded the opportunity to respond to the allegations and advise the Superintendent or his designee of any witness or evidence which may challenge the accuracy of the allegation. Should the Superintendent elect to proceed with punitive measures, then the employee shall be afforded all due process rights specified by law.

If there is a public announcement by the Board that the employee may be disciplined, whether or not there is an accompanying reduction in employee pay, the employee may appear before the school board in an open session, within thirty days after the conclusion of an investigation and prior to Board action, and be given a reasonable time, as determined by the Board, to comment on the

investigation and any actions taken or proposed to be taken involving the employee. Nothing in this paragraph shall inhibit the Board from suspending an employee, with or without pay, under appropriate circumstances.

At all times during the investigative procedures the Superintendent or his designee shall strive to obtain the specifics of the allegations of misconduct, including date, time, location, and other details of the alleged offense. The employee against whom the allegations have been made shall be advised, within the parameters of each particular case, of the specifics surrounding the alleged misconduct. The employee may have a representative of his/her choice to appear with him/her at any level of the investigation.

Complaints of misconduct shall be handled as expeditiously as the circumstances surrounding each particular case will allow. Any hearing, formal or informal, before the Superintendent or the Board, shall be conducted with rapidity. Evidence from the employee shall be accepted and accorded due consideration.

For purposes of this policy, the term *"misconduct"* shall include the commission of immoral offenses involving students or others, corporal punishment, neglect of duty, incompetency, dishonesty, insubordination, violation of School Board policy, or any other conduct which may call into question the employee's ability to discharge the duties attendant to his position.

This policy is not intended to supplant any grievance procedures which may be in existence and available to any employee. Further, this policy shall not supersede the employee's right to formal hearings specified by law including, but not limited to, La.R.S. 17:443, et seq.

(Emphasis added).

The specific GCN policy procedures that were filed as a joint exhibit and are at issue in this case are located in Section II, "Dismissal of other Nonprofessional Personnel:"

The principal recommends in writing to the Director of Human Resources that the employee appear before a committee consisting of the principal, supervisor and the Director of Human Resources or Assistant in Human Resources to discuss *the deficiencies*.

8

> If improvement or change is not effected after appearing before the committee, a recommendation to terminate the employee shall be made jointly by the supervisor and the principal to the Superintendent in writing.

> At the request of the Superintendent, the Director of Human Resources shall inform the employee that he/she is to appear before a committee consisting of the principal, the supervisor and the Director of Human Resources or Assistant in Human Resources at which time the reason(s) for dismissal will be discussed.

> At this time, the employee will be given the opportunity to resign. If the employee chooses not to resign, the Superintendent's recommendation shall be presented to the Board for action. The employee shall be informed in writing of the Board's final decision.

> A copy of all documents pertaining to an employee's performance shall be placed in the appropriate official personnel file, Human Resources Department, Lafayette Parish School Board. A copy of the above shall also be provided the employee.

(Emphasis added).

Ms. Alexander's employment came under review by the principal and Area Director solely because of her specific comments to another teacher. Specifically, Ms. Alexander reportedly stated, "I should bring a gun and shoot off [Principal Lilly's and the counselors's] fucking heads. I'd rather not have to do that. What I'm saying is if they made me mad enough, I would." The trial court correctly considered whether these comments constituted "deficiencies" in performance, as addressed by the GCN policy or "misconduct," which is the subject of the GAEB policy.

The portion of the GCN policy filed as an exhibit in the record does not provide a definition of "deficiency." However, the testimony offered by school board personnel reasonably supports the trial court's conclusion that the comments made by Ms. Alexander did not constitute a deficiency in performance that was subject to

review under the GCN policy. Superintendent Easton testified that the policy violation committed by Ms. Alexander constituted "misconduct" as set forth in the GAEB policy. Specifically, he testified that Ms. Alexander's comments fit within the "catchall" definition of "misconduct" set forth in the GAEB policy, which states:

> For purposes of this policy, the term "misconduct" shall include the commission of immoral offenses involving students or others, corporal punishment, neglect of duty, incompetency, dishonesty, insubordination, *violation of School Board policy, or any other conduct which may call into question the employee's ability to discharge the duties attendant to his position.*

(Emphasis added). Principal Lilly, who worked as Director of Human Resources for the school board in the past, also testified that the GCN policy was not the applicable policy to address the allegations against Ms. Alexander. He testified that the GCN policy is intended to cover employee performance and stated, as well, that Ms. Alexander's comments constituted "misconduct" as defined by the "catchall" section of the GAEB policy. Ms. Alexander offered no evidence in opposition to these opinions.

The trial court found that the GAEB policy applied because the behavior at issue—comments about doing serious harm to co-workers—constituted "misconduct" as defined by the GAEB policy. We agree. After reviewing the record and each policy, we find that the meaning of the terms "misconduct" and "deficiency" as set forth in the relevant policies are not ambiguous. The trial court did not err in ruling that the GAEB policy, governing employee "misconduct," applied to the investigation of the allegations that had been made against Ms. Alexander. Therefore, having found that the GAEB policy applied to the facts of this case, we must now determine whether the school board substantially complied with the

10

procedures set forth therein, including affording Ms. Alexander the due process offered by its terms, prior to terminating her.

### *Substantial Compliance and Due Process*

#### *Substantial Compliance*

"[T]he administration of the school system is entrusted by the constitution and the legislature to the parish school boards and not to the courts." *Myres v. Orleans Parish Sch. Bd.*, 423 So.2d 1303, 1305 (La.App. 4 Cir. 1982), *writ denied*, 430 So.2d 657 (La.1983) (citing *Chantlin v. Acadia Parish Sch. Bd.*, 100 So.2d 908 (La.App 1 Cir. 1958)); *see also, Harris v. West Carroll Parish Sch. Bd.*, 605 So.2d 610 (La.App. 2 Cir.), *writ denied*, 609 So.2d 255 (La.1992). Accordingly, the courts review school board actions for a determination of whether its actions constituted an abuse of its discretion. *Harris*, 605 So.2d 610. This has been interpreted to mean "where there is a rational basis, which is supported by substantial evidence for the school board's discretionary determination, the courts cannot and should not substitute their judgment for that of the school board." *Id*. at 613 (citing *Myres*, 423 So.2d 1313; *Chantlin*, 100 So.2d 908; *Baker v. St. James Parish Sch. Bd.*, 584 So.2d 369 (La.App. 5 Cir.), *writ denied*, 588 So.2d 1118 (La.1991)).

In our review of the record, we find substantial evidence of the school board's compliance with the GAEB policy. The GAEB requires, first, that a report of misconduct be made to a principal, administrator, or supervisor who is then required to notify the Superintendent or his designee of the allegations. In this case, it is clear that once Ms. Doucet notified Principal Lilly of the allegations of misconduct against Ms. Alexander, he, in turn, notified Mr. Brown, the Area Director (his supervisor), and, thereafter, Superintendent Easton via telephone and written letter.

The GAEB policy then requires the Superintendent or his designee to promptly confer with the principal or other supervisor of the accused employee to gather pertinent information regarding the allegations so as to determine what, if any, immediate action may need to be taken. The Superintendent or his designee is to also informally confer with the involved parties to attempt a resolution at that time. In this case, Mr. Brown met with Principal Lilly to discuss the report about Ms. Alexander's comments, and they both met with Ms. Alexander to discuss the alleged behavior.

Based on information obtained at that point, the policy authorizes the Superintendent or his designee to decide whether a formal investigation is needed and/or whether suspension of the employee is necessary during the investigation. The record reveals that after meeting with Ms. Alexander, Principal Lilly and the Area Director advised Ms. Alexander that she would be suspended with pay pending further investigation, and she was escorted off the campus.

The next procedures address guidelines for conducting a formal investigation, including informing the accused employee of the findings and offering the employee a chance to respond with additional information. The accused employee is, thereafter, to be allowed to appear before the school board in open session if there is a public announcement by the school board that the employee may be disciplined in any manner. The facts show that there was no formal investigation conducted after the preliminary, informal investigation conducted by Principal Lilly and Mr. Brown. Principal Lilly testified that no formal investigation was instituted because of Ms. Alexander's admission to having made the statements, his knowledge of her prior threats made against at least one other employee, and her past involvement in altercations with co-workers. We find no abuse of the

Superintendent's designees' discretion, which determined that no formal investigation was necessary.

The next actions taken in regard to Ms. Alexander's employment came from Principal Lilly, who recommended her termination in a written letter to the Superintendent. The Superintendent accepted the recommendation and notified Ms. Alexander in writing, via certified mail, of the recommendation that she be terminated. In that letter, he provided her with notice of the school board meeting during which her termination would be considered and afforded her the opportunity to appear with a representative at that hearing. Although Ms. Alexander's matter was not addressed in open session, we find that she was properly afforded the notice and opportunity to be heard, prior to her termination, as contemplated by the policy. Consequently, we find no error in the trial court's determination that the school board substantially complied with the policy's procedures in this case.

*Due Process*

Ms. Alexander contends that the trial court's decision should be set aside because she was not afforded constitutional due process of law prior to her termination. It is important to clarify that Ms. Alexander was not a certified teacher, but was a teacher's assistant in the computer lab of the high school, bearing the title of Computer Proctor. Consequently, Ms. Alexander did not possess a state or federally-protected property interest in maintaining her employment and, therefore, no entitlement to due process prior to being terminated. *Wilhelm v. Vermilion Parish Sch. Bd.*, 598 So.2d 699 (La.App 3 Cir. 1992); *Harris*, 605 So.2d 610.

She was, nevertheless, entitled to those rights set forth in the procedures established by the Lafayette Parish School Board in its "Allegations of Misconduct Policy," also referred to as the GAEB policy. *See id.* Therein, the school board

13

recites its recognition of its employees' rights to privacy and due process of law and states that its procedures for the investigation of employees accused of misconduct were designed to address those competing interests. Consequently, Ms. Alexander did have a reasonable expectation that she would be afforded due process before termination under the terms of the GAEB policy.

The trial court stated during its oral recitation of its ruling that it found the school board had procedurally afforded Ms. Alexander due process. We agree. Due process of law constitutes, minimally, that any deprivation of life, liberty, or property be protected by notice and an opportunity to be heard. U.S. Const. amends. V, XIV; La.Const. art. 1, § 2. The record provides evidence that Ms. Alexander was afforded due process. She received notice of the allegations against her when she was presented with Ms. Doucet's written statement during her meeting with Principal Lilly and Mr. Brown, the Area Director. She was also allowed to comment on the statement prior to any action being taken. Also, once a decision had been made to terminate her, she received written notice, via certified letter from Superintendent Easton, of the school board meeting during which his recommendation for her termination was to be considered. Ms. Doucet was afforded an opportunity to be heard as well. The record reflects that she attended the school board meeting and was represented by counsel. Accordingly, we find that the trial court's ruling stating Ms. Alexander was afforded due process is reasonably supported by the record and is not manifestly erroneous.

IV.

## CONCLUSION

The judgment of the trial court, dismissing plaintiff-appellant, Mary Margaret Alexander's Petition for Declaratory Judgment and Writ of Mandamus, is affirmed. Costs of this appeal are assessed to Mary Margaret Alexander.

**AFFIRMED.**